FRANK N. PHELPS, APPELLEE, V. JOHN W. BERGERS, APPELLANT.

FILED JANUARY 16, 1913.   No. 16,909.

1. Husband and Wife: ALIENATION OF WIFE'S AFFECTIONS: EVIDENCE. In an action for damages for the alienation of the affections of the plaintiff's wife, she not being a party to the action, evidence of admissions made by her are incompetent. A witness testified that he saw plaintiff's wife coming out of the house of defendant, and after he followed her a short distance she made admissions in answer to statements of the witness. *Held,* That such admissions were not competent as *res gestœ.*

2. ———: ———: DAMAGES: EVIDENCE. In such action, evidence that plaintiff mistreated his wife, and was intimate with other women during the time in which he alleges that her affections were alienated, is competent as affecting the measure of damages; and when he testifies to injuries to his feelings, mental suffering, and such like matters as enhancing his damages, he may properly be cross-examined as to his conduct tending to show his failure to appreciate and value her affection for him.

3. ———: ———: EVIDENCE. In such action, evidence that the defend-
ant assisted plaintiff's wife in procuring a divorce, in furtherance
of his main design to alienate her affections, is competent as a
circumstance tending to prove the main issue. Such evidence
should not be submitted to the jury as establishing a cause of
action in itself.

4. ———: ———: MALICE. When her parent, or one to whom the
wife naturally looks for advice, counsels her as to the best course
to pursue relative to her marital trouble, the question of good faith
or malice on the part of her adviser is important and calls for an
instruction to the jury upon that point. When a stranger inter-
feres in the family affairs of others, there is no presumption of
good faith. In the latter case, an instruction that it is necessary
to prove malice, and that the law presumes malice from wrongful
acts, is unnecessary and improper.

APPEAL from the district court for Douglas county:
WILLIS G. SEARS, JUDGE. *Reversed.*

*Byron G. Burbank,* for appellant.

*McCoy & Olmsted,* contra.

SEDGWICK, J.

The plaintiff began this action against the defendant in
the district court for Douglas county, and recovered a
verdict and judgment from which the defendant has ap-
pealed.

In his petition, as amended, the plaintiff alleges that
he is 27 years old, and was born in the city of Omaha, and
on the 23d day of June, 1906, he was married to Josephine
M. Rhoda, who is now about 23 years old; that plaintiff
and his wife had one child, a boy, who died in April, 1909,
at about the age of 18 months; that the plaintiff and his
wife lived happily together until about December 1, 1908,
and that from about the 15th of November, 1908, until
April 1, 1909, the plaintiff and his wife kept house at
2304 Dewey avenue, in the city of Omaha; and that about
January 1, 1909, the defendant, having separated from his
own wife, rented, furnished and moved into the house at
No. 2321 Dewey avenue, and in close proximity to the

plaintiff's said home; that since about the 1st day of January, 1909, the defendant has lived alone in his said house, except in this; that he kept and keeps there a Japanese or Korean cook or housekeeper; that since November 15, 1908, and until about April 15, 1909, the defendant, well knowing the said Josephine M. Phelps to be the wife of the plaintiff, and wrongfully contriving and intending to injure the plaintiff and deprive him of her company, assistance, love and service, did wilfully and maliciously, and without privity of consent of the plaintiff, and at defendant's said house and elsewhere in the city of Omaha at divers times during said period, persuade and induce plaintiff's wife to visit him at his rooms at 2321 Dewey avenue, aforesaid, and at other places now unknown to the plaintiff in the city of Omaha, and did then and there debauch and carnally know her, the plaintiff's said wife; that frequently during the time since November 15, 1908, and up to about April 15, 1909, and while the plaintiff was enjoying the comfort, affection, companionship and service of his said wife and having a household as aforesaid, the defendant studiously and continuously with wicked intent planned and undertook to deprive the plaintiff of the society, affections and assistance of his wife, and with such intent did so prejudice and poison plaintiff's wife's mind against the plaintiff, and so far alienated her affections from him, as to induce her to desire and seek to obtain a divorce and separation from him; and that the defendant, for the purposes aforesaid, counseled, advised, aided, and assisted the wife of plaintiff in her efforts to procure the commencement of divorce proceedings against plaintiff, and that the defendant did by the means aforesaid so far prejudice and poison the mind of plaintiff's wife against her husband, and so far alienate her affections from him, as to persuade and induce her to refuse to recognize or receive the plaintiff as her husband; and that she, plaintiff's said wife, acting under such advice and influence, did refuse to recognize or receive the plaintiff as her husband or to live with him as his wife, and

did, without any good cause, about April 1, 1909, sue the plaintiff for a divorce and for the custody of their child, Frank Phelps, and did cause plaintiff to be restrained and enjoined from visiting her, his wife, or their said child. And pursuant thereto, and for the reasons aforesaid, plaintiff's said wife did leave and desert her home and plaintiff, and take with her their said boy, Frank Phelps, and remove him to her mother's home in Omaha, Nebraska, where plaintiff's said child contracted the measles from a servant in that home and died on April 23, 1909, as a consequence thereof; whereby the plaintiff has wholly lost and been deprived of the comfort, fellowship, society and assistance of his wife, and whereby the plaintiff and his wife have lost their child as aforesaid. The plaintiff alleged damages in the sum of $25,000. The defendant answered admitting plaintiff's age and the age of his wife as alleged, and their marriage, and residence of the plaintiff and his wife as alleged, and the birth and death of the child as alleged, and denied all other allegations of the petition. The jury rendered a verdict in plaintiff's favor for $16,666.67. Upon a motion for a new trial, the court required the plaintiff to remit $6,666.67 from the verdict and entered judgment upon the verdict for $10,000.

Upon the trial the plaintiff, as witness in his own behalf, testified that he and his brother on the 12th day of April, 1909, watched the residence of the defendant from about 4:30 o'clock in the afternoon until a little after 8 o'clock in the evening, and that he was at that time about 20 feet from the back door of Bergers' home, and saw his wife come out of the back door of Bergers' house to the sidewalk, and the plaintiff followed her. He overtook her shortly, and they were then joined by plaintiff's brother, Alfred. The plaintiff then by his counsel was asked if he had any conversation with his wife when he first caught up with her at that point, and he answered that he did; and was then asked: "What did you say to her?" This was objected to "as hearsay, incompetent, irrelevant and immaterial; no ways binding upon the de-

fendant." The plaintiff's counsel stated that it was a part of the *res gestæ*. The court allowed the plaintiff to answer, and the defendant excepted to the ruling. The plaintiff answered: "I said, 'Well I have caught you red-handed at last.'" His counsel then asked him: "What did your wife say to you at that time?" The defendant interposed substantially the same objections as before, which were overruled, and the plaintiff excepted. The witness answered: "She said, 'Well, as long as I am caught, I might as well own up to it.'" The admission of this evidence is now assigned as error. This evidence was clearly incompetent. The wife was not a party to the suit. She therefore could not make admissions that would be binding upon the defendant. If the defendant was with her in his house, they were separated at the time this statement was made by her. It is said in *Collins v. State*, 46 Neb. 37: "The term '*res gestæ*' means things done in and about, and as a part of, the transaction out of which the litigation in hand grew and on which transactions said litigation is based." The statement of Mrs. Phelps was not any part of the transaction that took place at the house, and was therefore nothing more than an admission that she had been in the house of Mr. Bergers without any explanation of her purpose in being there. It is not necessary to determine whether, in the condition of this record, the error in receiving this evidence would be so prejudicial as of itself to require a reversal, since that question will not of course be presented upon another trial.

The defendant insists that the court erred in refusing to permit necessary cross-examination of the plaintiff. The plaintiff had testified substantially that the alienation of his wife's affections and her relation with the defendant caused him great worry and a nervous breakdown, and that by reason of it he was obliged to give up his position in order to recover his health. Upon his cross-examination it was sought to show that, during the time of the alleged intimacy between Mr. Bergers and the plaintiff's wife, the plaintiff himself was upon very

friendly relations with other married women. He was asked: "You have been going around a good deal with Mrs. Kennedy, haven't you?" Objection to this question was sustained, and the defendant excepted, and said: "I offer to show that he had been going around a good deal with Mrs. Kennedy." This was objected to and was refused. The witness was then asked: "Well, you knew, did you not, that Mrs. Phelps was watching you with reference to your conduct with other women, didn't you, from and after April 1, 1909?" Objection was sustained to this question, and defendant's attorney stated: "I offer to show by the witness that he knew that Mrs. Phelps was watching him as to his conduct with other women from and after April 1, 1909." This was objected to and the objection sustained. In view of the plaintiff's testimony and the conditions that he testified to for the purpose of increasing the amount of damages that he might recover, it was clearly competent to show his intimacy with other women in the time specified. The plaintiff insists that this would be a substantive defense, and if relied upon by defendant should be alleged and proved as such. There was no such defense pleaded in the answer. The cross-examination, however, might properly have been allowed as throwing light upon the plaintiff's evidence as to the damages suffered by him in the particulars above mentioned.

The offer of proof made by defendant's counsel was not very comprehensive. It has been said by this court that no offer of proof is necessary upon the cross-examination of witnesses. If, however, it is not apparent from the question asked that the matter which it is sought to investigate is a proper subject of cross-examination, it is necessary to inform the court how the question asked will be connected with the examination in chief. Counsel should make it appear that his questions will legitimately lead to a proper subject for cross-examination of the witness. When it appears from the statement of counsel or offer of proof, in connection with the questions he pro-

pounds, that the matter is a proper and necessary subject of cross-examination, the court will of course allow the questions. The proof offered, and at first excluded, seems to have been substantially admitted later, so that defendant was not prejudiced, unless his evidence of this character was apparently discredited by the rulings of the court thereon.

Plaintiff's wife began an action against him for a divorce on the first day of April, 1909. The court submitted to the jury an instruction stating as one of the issues presented that "the defendant procured or was party to the procuring of a divorce action brought by plaintiff's wife against him in furtherance of a design on defendant's part to destroy plaintiff's said family and home relation with his wife." The main issue tried was whether the defendant had alienated the affections of the plaintiff's wife. Evidence that the defendant assisted her or encouraged her in procuring a divorce was perhaps competent under the circumstances as bearing upon the main issue. It should not have been singled out and given in charge to the jury. This seems to be conceded in the plaintiff's brief, but it is insisted that objection was not made in time, and that the error was immaterial and was waived by the defendant. It is of course not necessary to discuss these features of the matter, as the error of giving this instruction will not be repeated upon another trial.

The court gave the following instruction: "You are instructed that any enticements of the plaintiff's wife, if any, by the defendant, with a view of causing a separation, otherwise than those of an adulterous nature, must be shown to have been maliciously done; but the law presumes malice, if one wrongfully does acts tended to disturb the harmony of the family relations between husband and wife, and concludes that such acts were malicious." It is insisted that it was error to tell the jury that the law presumes malice. There may be some doubt whether the jury would consider the word "tended" as meant for "intended" or for "tending." If the wrongdoer intended

that his wrongful acts should disturb the family relations between husband and wife, such conduct would be malicious. When a parent, or one to whom she naturally looks for advice, counsels a wife as to the best course to pursue relative to her marital troubles, the question of good faith or malice on the part of her adviser becomes important and calls for an instruction upon that point. The usual practice in such cases is to define malice and leave the question to the jury as to whether or not the defendant was actuated by malicious motives. When a stranger interferes in the family matters of others, there is no presumption of good faith. If his acts were wrong-ful and calculated to alienate the wife's affections from her husband, and did in fact produce that result, he is liable for such damages as he occasions. The first part of instruction No. 5 was erroneous as against the plaintiff, and the latter part as against the defendant. No such instruction in this case is called for.

The defendant insists that there was not sufficient evidence in the record to sustain the verdict based upon the second cause of action alleged in the petition; that is, the seduction by defendant of plaintiff's wife, and committing adultery with her. It is not deemed advisable to determine or discuss this assignment, since the plaintiff may produce different and further evidence upon another trial.

In his petition the plaintiff asked for $25,000 damages. The verdict was for precisely two-thirds of that amount. Upon a motion for a new trial in the court below, affidavits of the jurors who tried the case were filed tending to show how the jury arrived at this verdict. It is insisted that these affidavits show that it was agreed by the jury that each juror should mark the amount that he thought the plaintiff should recover; that these amounts should be added together and the sum divided by the number of jurors to estimate the amount of the verdict, and that this result was so near two-thirds of the amount asked for by the plaintiff that they agreed to accept that amount as the proper verdict. It is insisted that this was

such improper conduct on the part of the jury as to require a reversal. The affidavits of several of the jurors were filed denying that the verdict was so arrived at, and explaining the matter in such a way as to show no gross impropriety in their method. Upon this conflicting evidence the trial court found that there was no such misconduct shown as to require a new trial, and without further discussing the evidence on this point we are satisfied that this finding of the trial court is supported by the evidence.

On the 1st day of April, 1909, the plaintiff's wife began an action for a divorce. They never lived together after that time, and when the case at bar was tried in the district court the divorce had been granted. The plaintiff testified that from the time of their marriage, which was something less than three years before the action for divorce was begun, until some time in November, 1908, their marriage relations had been pleasant and in all respects satisfactory. He testified that in November, or early in December, 1908, their relations were changed. "She became indifferent to me and the home in general." He was asked whether from the 15th day of November, 1908, until April 1, 1909, his wife's attitude toward their infant child and their home was different from what it had been prior to that time, and answered: "It was, she seemed to be indifferent." She testified that during all of their married life he was abusive to her, and was very frequently guilty of acts of personal violence against her. In this she was corroborated by her mother, and to some extent by other witnesses who seemed to be disinterested and reliable. It would seem that, whoever was at fault for the alienation of her affection for her husband, it had been substantially accomplished on or before the 1st day of April, 1909. There is no evidence that she knew or had ever seen defendant prior to some time in January, 1909, several weeks after the process of alienation had begun, according to the plaintiff's testimony. In January, 1909, the plaintiff's wife with a young lady and a small

child, attended the automobile show in Omaha, and there
she casually met the defendant.   There is no evidence of
any impropriety or anything unusual under such circum-
stances between them on that occasion.   The plaintiff tes-
tified that on the 26th day of March, 1909, he heard a
conversation between his wife and Mr. Bergers on the tele-
phone which would indicate improper relations between
them at that time.   He is not supported in this testimony,
and both his wife and Mr. Bergers deny that they ever had
any conversation over the telephone at any time.   Several
circumstances are testified to as occurring after the di-
vorce proceedings were begun that would indicate similar
relations between her and Mr. Bergers.   The plaintiff and
his brother testify as to having watched Mr. Bergers'
house some time during April, and that they saw the
plaintiff's wife come out of the back door of the house, and
that she then substantially admitted to them that she had
been in Mr. Bergers' house for some time.   Again, another
witness testified that about the 1st of April he saw her
coming out of Mr. Bergers' house.   This might have been
before or after the commencement of the divorce proceed-
ings, as the witness testified, "I don't know anything about
the date."   Another witness saw her and Mr. Bergers talk-
ing in one of the public buildings of the city.   This was
about the time the divorce proceedings were begun.   She
and Mr. Bergers both testified that this was a casual meet-
ing and only a few words passed between them, which was
not disputed.   While the divorce proceedings were pend-
ing, and after the case at bar was begun, on the invitation
of Mrs. Phelps' parents, Mr. Bergers called at their home,
where she was living.   From that time on Mr. Bergers
seems to have taken an interest in her relations with her
husband, and in furthering the prosecution of her suit,
as well as in the defense of his own.   The plaintiff was
very active in watching the actions of his wife while these
suits were pending.   He says that he was frequently driv-
ing with his automobile to keep watch of her and Mr.
Bergers.   On these occasions he generally took some female

companion with him to assist in the watch, and particularly and frequently a certain married woman, whom he says had formerly been a schoolmate of his, and with whom he was on quite friendly terms. On the other hand, his wife was also watching him, and the evidence shows that Mr. Bergers continually assisted her in this. During this time the plaintiff's wife and Mr. Bergers were frequently seen driving in his automobile, and they made no denial of it on the witness stand.

We think that the evidence upon the main issue presented was sufficient to justify a submission of the case to the jury. There was, however, no evidence to justify a verdict in the amount found. When we consider the relation that had existed between the husband and wife before she had ever seen or known anything of the defendant, and the plaintiff's surroundings and conduct before and after their separation, it is impossible to believe that this verdict of $16,666.67 was based upon any consideration by the jury of the actual damages that the plaintiff might have suffered. It clearly shows that the verdict was derived from something other than the evidence in the case. A verdict so obtained cannot be allowed to stand. The trial court required the plaintiff to remit a large part of the verdict. If the verdict had been of such a nature as to justify the belief that the jury had attempted to derive their verdict from the evidence, a remittitur might be required and an affirmance justified; but when it appears that the verdict must have been reached from passion or prejudice, or through some influence outside of the evidence, it is the duty of the court to set it aside.

The judgment of the district court is reversed and the cause remanded for further proceedings.

REVERSED.