Argued January 4, affirmed January 18, 1916.

## SINK v. ALLEN.*

(154 Pac. 415.)

**Appeal and Error—When Verdict will not be Disturbed.**

1. Where a cause is tried before a jury and there is any substantial evidence to support the issues made, in the absence of error of law, the verdict is conclusive.

**Bills and Notes—Evidence of Fraud—Validity.**

2. In an action on a note given to a broker in payment of commissions on a transaction not completed when note was executed, evidence examined and *held* to show that the execution of the note and its delivery was procured by fraud.

**Bills and Notes—Rights of Purchaser in Good Faith and Without Notice.**

3. Where it is proven that the note in controversy was procured through fraud, the payee's transferee is in no position to enforce payment, unless he is a purchaser in good faith and without notice of such fraud.

---

*The effect of fraud in the inception of negotiable instruments transferred on the presumption that he knew the facts that impeach its validity and on whom is the burden of proof is discussed in note in 17 L. R. A. 328.          REPORTER.

**Bills and Notes—Burden of Proof to Show Good Faith.**

4. Where it is established that the original payee obtained the note on which action is brought through fraud, his transferee has the burden of proof, and must show he acquired such note in good faith, for value, and without notice of such infirmity.

[As to who is a *bona fide* holder, see note in **11 Am. St. Rep. 309.**]

**Trial—Order of Proof is in Discretion of Court.**

5. The order of proof is in the sound discretion of the court, and it is not an abuse of such discretion in an action on a note alleged to have been obtained through fraud with which the indorsees were charged to allow proof of such fraud, before the introduction of proof that the present holder was charged with, and had knowledge of the fraud.

**Bills and Notes—Evidence not Sufficient to Show Holder a Bona Fide Purchaser.**

6. In an action on a note alleged to have been procured through fraud, evidence examined and *held* to show that the plaintiff was not a *bona fide* purchaser of said note for value, and without notice.

From Sherman: DAVID R. PARKER, Judge.

Department 1.   Statement by MR. JUSTICE MCBRIDE.

This is an action by E. Sink to recover upon a promissory note given by J. M. Allen to one Walter H. Moore, and by him indorsed as collateral security upon a joint note from himself and J. A. Harbke to the Wasco Milling Bank, in Moro. Harbke subsequently paid the note given to the bank, and the Allen note was turned over to him. Harbke states the acts constituting his title to the note in this language:

"In the first place, I paid what he [Moore] borrowed at the bank to buy an automobile with, and the note was turned over to me. I held it until I sold my part of the garage to him. Then he turned over that note with some others. We probably had a couple or three thousand dollars standing out here, and he took the whole thing and gave me two or three different notes, and then his own note for $800. * * The money we borrowed we used in the automobile business. If I had stayed in the business, half of the money would be mine, but I sold out, and that money was carried right along with the debts, so it all came out of him."

The facts leading up to the execution of the note by Allen and its subsequent transfer to plaintiff may be briefly summarized as follows: For years W. H. Moore and defendant had been very close friends. Defendant was living at Sisters, Crook County, Oregon, but had large holdings of real estate in Sherman County, which he wanted to sell, and for several years Mr. Moore had been living in Portland, and had been engaged in the real estate business, banking, investments, etc. In the fore part of May, 1913, defendant and his wife, having business in the Henry Building, in Portland, noticed Walter H. Moore's name on one of the office doors. Mr. Allen said:

"I will go in and see Walter; I have known him for years."

In the office they found Mr. Moore, J. A. Harbke, and an elderly man by the name of Springer. Moore introduced Mr. Harbke to Mr. and Mrs. Allen as his partner, saying, in effect, that they were soon coming back to Sherman County to engage in the automobile and real estate business, that Harbke would run the business in town, and that he would look after it on the outside. Moore left the office a few minutes, and Allen noticed that Harbke and Springer were talking about a deal for Springer's property, but that Harbke did not seem to have anything satisfactory to offer. Allen then said that he had a stock and grain ranch that might suit Springer's son, the one for whom the deal was to be made. While Allen and Springer were talking Moore returned, and, after conversing with Harbke in an undertone for a time, asked Harbke if he had nothing else to put up. Then Moore heard Allen and Springer talking trade, and he joined them and said:

"Why, Johnny, I didn't know your place was for sale. I thought you had got rid of that. Yes; your place would be just what this man wants."

Thereupon they discussed various phases of the proposed deal, the kinds and values of the respective properties, etc., and arrangements were made. That afternoon Allen and his wife went out with Moore and Springer to look over the Springer properties in Portland which were to be considered in the trade. Allen informed Mr. Moore that, not being familiar with Portland prices, he would have to depend on him as an old friend to see that he got a good deal and right prices; also that the property must be such that Allen could secure a loan of at least $15,000 on it in order to clear up indebtedness and pay the mortgages on his farm, as he would have to turn the farm over to Springer clear of encumbrance. Moore assured him he would see to it that Allen got that much or even $20,000 if he needed it as a loan on the Springer property, and would see that the prices were fair and reasonable. The first property looked at was on Lucretia Street, and was priced to Allen at $15,000, and Moore told him it was well worth it. They looked over the remainder of the property, had a general understanding in regard to the same, and arranged for Mr. Springer's son to examine the Allen properties in Sherman County. Agreeing to meet later, defendant and his wife went home. Upon notice from Moore they returned to Portland the latter part of May, where they again talked over the details of the trade. Among other things, Allen found that the price of the Lucretia Street property had been raised from $15,000 to $25,000. Allen objected to this, but Moore insisted that the property was well worth that amount, that it would be easy to secure the necessary loan, and that

the deal was a good one. Finally, the terms having
been again accepted under Moore's assurance and
the positive understanding and condition that unless
the loan could be secured the deal could not be com-
pleted, Moore went to Attorney Hosford's office and
had the contract drawn. Later in the day they all
went to the attorney's office and on the plea that
the Springers were in great haste to catch the train,
the contract was only hastily sketched over and ex-
plained, but not read. Moore assuring Allen that
everything was all right, the contract was signed, and
immediately sent to Southern Oregon for the signa-
tures of the other parties thereto. It was some time
before Allen saw the contract again, and before he
found out that the clause concerning the $15,000 loan
had been omitted. After signing the contract the
Springers immediately left, and Moore and Mr. and
Mrs. Allen went down on the street. Moore then asked
Mr. and Mrs. Allen to go over to his office, and sug-
gested that they give him the note now in question to
cover his commission. They informed Mr. Moore that
the deal was yet uncertain, and that the commission
was not yet due, but he finally prevailed upon them to
go up to his office. There he referred to old times,
reciting several instances in which they had helped one
another, and claiming that their relations had been a
great deal like brothers. He informed them that of
late years he had had a hard time, that the note would
help him, and again assured Allen that the deal would
go through and was a good transaction, that he would
see to it that Allen secured the loan above referred to,
and that the note should never go out of his hands,
and, further promising them that in case the deal
should not go through he would return the note to
them, he wheedled Allen into signing the note, which

was for $1,659.25. Of this $1,000 was commission
from Allen to Moore, and the balance was a part of
Springer's commission, assumed by Allen as a part of
the terms of the deal, all to become due when the deal
was completed. Notwithstanding Moore's promise not
to transfer the note, in just about one week's time he
had sent the note up to his partner at Moro, where it
was put up as collateral security to the bank at Moro
for a partnership loan to Moore & Harbke for $1,000.
Later Harbke paid off the note to which the said note
of Allen was collateral, and said note of Allen was
turned over to him. About August, 1913, Moore &
Harbke claim to have dissolved their said partnership
business in Sherman County, and Harbke claims to
have acquired the note in the adjustment of said busi-
ness with Moore, but did not take over the note until
after he had conferred with plaintiff in regard to the
same, and thereupon some understanding was had to
the effect that, when Harbke should take over the Allen
note, it should be passed on to plaintiff, and Harbke
should have credit for the amount of the same, upon
a note for $27,000 claimed to be due from him to plain-
tiff. Harbke did not indorse the note to plaintiff.
Plaintiff claims to have accepted the Allen note, with-
out indorsement as aforesaid, for the full amount of
its principal and interest, and to have credited the same
upon a note for $27,000 from Harbke to him, secured
by one of the best farms in Sherman County; that said
$27,000 note of Harbke so due to him was kept in
Harbke's safe in his office in Portland, to which plain-
tiff had no key; that they took this note out of Harbke's
safe, acting together, and took it over to another office
to have a bookkeeper indorse the payment on the back
in order, as plaintiff said, that it might be done legally.
In the meantime Allen and Moore had made many at-

tempts to secure the loan on the Springer property.
After remaining in Moro a few months Harbke re-
turned to Portland, and, at Moore's suggestion, Allen
tried to get the said loan through Harbke. He also
tried through many others, but the best offers he could
get were from only $7,000 to $9,000, thus showing that
Moore's valuation of the Springer property was ridicu-
lously high, and that the values had been grossly mis-
represented. Not being able to get the required loan,
the deal fell through, the commission was never earned,
and the said note was wholly without consideration.
Allen then made efforts to get the note back from
Moore. He phoned to him at Moro from Redmond, in
Crook County, and after a strenuous effort he arranged
for a meeting with him in Portland, but Moore was
sick and unable to come, and the next day or the day
following Allen read of Moore's death. Moore and
Harbke had been associated together for many years
in various business undertakings, part of the time as
partners. Harbke and Sink were also closely asso-
ciated and connected in business deals, sometimes hold-
ing themselves out as partners. They used the same
office and equipment, their business cards bore the in-
scription "Harbke & Sink," with their office address,
and Sink kept some of his most valuable papers in
Harbke's safe, particularly Harbke's own note for
$27,000.

Upon the trial there was a verdict and judgment for
defendant, from which plaintiff appeals. AFFIRMED.

For appellant there was a brief and an oral argu-
ment by *Mr. L. E. Crouch.*

For respondent there was a brief over the names of
*Messrs. Bright, Bryant & Ellis* and *Mr. Robert R. But-
ler,* with an oral argument by *Mr. Cornelius J. Bright.*

MR. JUSTICE MCBRIDE delivered the opinion of the court.

1. This case having been tried before a jury, it follows that, if there is any substantial evidence tending to support the defense interposed, the verdict, in the absence of error of law, is conclusive, and a discussion of the comparative weight of the evidence is therefore unnecessary.

2. It seems clear to us that Moore perpetrated a cruel fraud upon a confiding old friend in obtaining the note. Allen received nothing for it whatever, and it was put into circulation in violation of Moore's solemn promise not to so use it. All the evidence indicates that Allen was inexperienced in business, that he relied upon Moore as an old and confidential friend to guide and assist him in the deal, and that the execution of the written contract was hurried up by Moore with a view to prevent Allen from observing that an important stipulation in the contract had been omitted.

3. Under the circumstances Moore could never have enforced payment of the note, and, if Harbke was not a purchaser in good faith and without notice of the infirmity of the note, he and plaintiff, to whom he transferred it without indorsement, are in no better position.

4. Moore's fraud being shown, the burden of proof to show the good faith of Harbke was upon the plaintiff: *Owens* v. *Snell,* 29 Or. 483 (44 Pac. 827); *Brown* v. *Feldwert,* 46 Or. 363 (80 Pac. 414).

5. It is contended that the court erred in admitting evidence of fraud upon the part of Moore in obtaining the note before the defendant had shown that Harbke took it with notice of the defenses which defendant had against it, and the case of *Dreilling* v. *First Nat. Bank,* 43 Kan. 197 (23 Pac. 94, 19 Am. St. Rep. 126),

is cited in support of this proposition. The case merely holds that under the particular circumstances there disclosed the court had the right to determine the order of proof, and that it did not err in requiring the defendant to introduce evidence of plaintiff's bad faith before attempting to show fraud in the execution of the note. As there observed, the order of proof is a matter largely in the discretion of the court, and in the case at bar the court, in the exercise of a like discretion, allowed proof of the original fraud to be first introduced.

6. In this case the natural course of inquiry would seem to direct itself to the following propositions: (1) Was the note procured by fraud and without consideration? (2) Did the indorsees of the note have knowledge of such circumstances as should have put them upon inquiry as to any fraud in the procurement of the note? The first proposition is too clearly proved to admit of doubt. Was there any evidence to sustain the second? While the evidence might not satisfy the members of this court sitting as triers of the fact, yet, if from the whole case there was any evidence tending to support defendant's contention, we are bound by it; and we think there is such evidence. It tended to show that Harbke and Moore were partners in the real estate business, and that Harbke was present when the original negotiations were broached with Springer. A few days afterward the note turns up in the bank at Moro as security for a partnership note of Moore & Harbke. It is inconceivable under the circumstances that Harbke did not know that no sale had been effected by Moore for defendant, and incredible that he did not know that the note was given for commission not yet earned, and which any business man ought to know would probably never be earned. He says that later

he paid off the partnership note and it was turned over to him, but his testimony indicates that he considered himself only a part owner until he and Moore dissolved partnership, whereupon finding, as he says, that the plaintiff would take it, he turned it over to him without indorsement and received credit upon an alleged $27,000 note which he had given plaintiff, but which he kept in his own safe. In addition to this, there is evidence tending to show that Harbke and Sink were doing business as partners, and that their relations were very intimate. From these and other circumstances the jury probably concluded that Harbke and Moore were partners in the attempt to swindle defendant in the first place by getting him to enter into an impossible deal and giving a note for which there was no honest consideration, and that plaintiff was merely helping Harbke to play the game. They had the witnesses before them, and could observe their appearance and manner of testifying. While courts should be slow to question the validity of negotiable paper, they should be vigilant to protect the ignorant and unwary from the machinations of those who by transactions such as these have brought much discredit upon the real estate business in this state and who are the bane of those who are legitimately and honestly conducting it.

The judgment is affirmed.          Affirmed.

Mr. Chief Justice Moore, Mr. Justice Burnett and Mr. Justice Benson concur.