Argued January 30, reargued March 26, reversed and remanded April 22, rehearing denied June 17, 1919.

## SCHNEIDER *v.* TAPFER.

(180 Pac. 107.)

**Evidence—Hearsay—Statement in Defendant's Absence.**

1. In action for alienation of affections of plaintiff's wife by defendant, her father, testimony of a witness regarding wife's statement, made in defendant's absence that defendant had given her money with which to procure an abortion was hearsay and inadmissible.

**Husband and Wife—Action for Alienation of Affections—Evidence Admissible.**

2. In action for alienation of affections of plaintiff's wife by defendant, her father, testimony to the effect that defendant had approved of abortion by wife *held* irrelevant to issues involved in the case.

**Evidence—Action for Alienation of Affections—Admissibility of Hearsay.**

3. In action for alienation of affections of plaintiff's wife by defendant, her father, testimony of plaintiff that his wife had told him before the marriage that her father and mother wanted her to quit plaintiff altogether was hearsay and incompetent, being made four years before wife finally left plaintiff.

**Husband and Wife—Alienation—Declarations of Alienated Spouse—Admissibility.**

4. Declarations of alienated spouse, made prior to alienation in the absence of defendant, are admissible when they tend to disclose affection and the relations between the spouses.

**Husband and Wife—Alienation—Declarations of Alienated Spouse—Admissibility.**

5. Declarations of alienated spouse, made in defendant's absence, are admissible when made at or approximately before alienation, where they are of a character likely to disclose the mind and motive of the alienated one and the effect on his or her mind or motive which the supposed words or conduct of defendant has had.

**Husband and Wife—Alienation—Declarations of Alienated Spouse—Admissibility.**

6. Where declarations of alienated spouse, made in defendant's absence, are not of a character which bear upon the mental state or motives of the alienated spouse, and where they are unaccompanied by any declarations upon her part which bear upon her mind or motive, they are wholly inadmissible.

**Husband and Wife—Action for Alienation of Affections—Evidence Admissible.**

7. The judgment-rolls in actions brought by defendant, father of plaintiff's wife, against plaintiff and wife after the culmination of the acts of alienation complained of, were inadmissible, being offered for the apparent purpose of showing malice on the part of defendant and that he was engaged in a general scheme to bring about plaintiff's ruin.

**Husband and Wife—Alienation of Affections—Elements of Wrong.**

8. In action for alienation of affections of plaintiff's wife by defendant, her father, plaintiff must prove: First, that defendant did actually alienate; and, second, that his action was malicious.

> [As to action for alienation of affections by parent, see note in Ann. Cas. 1917E, 1017.]

**Appeal and Error—Jury Findings—Review.**

9. The court on appeal has no right to review the jury's findings upon the weight of the evidence.

**Appeal and Error—Verdict Based on Possibility—Reversal.**

10. Evidence which merely suggests a suspicion or possibility does not bring the case within Section 3 of the amendment to Const. 1910, Article VII, providing that no fact tried by a jury shall be re-examined unless there is no evidence to support the verdict, and a verdict based on such evidence cannot be permitted to stand.

BEAN, J., dissenting.

From Multnomah: T. E. J. DUFFY, Judge.

In Banc.

Plaintiff was the son-in-law of the defendant. In September, 1916, plaintiff's wife left him and went back home to her father. Plaintiff brings this action against the father to recover damages for the alleged alienation of his wife's affections. He obtained a verdict and judgment against the defendant for the sum of $14,000, from which the defendant appeals, alleging error in certain rulings of the court below upon the admission of testimony, and also in refusing to grant defendant's motion for a judgment of nonsuit.

REVERSED AND REMANDED.

For appellant there was a brief over the names of *Mr. Joseph Van Hoomissen, Mr. Arthur I. Moulton* and *Mr. J. W. Oberender,* with oral arguments by *Mr. Hoomissen* and *Mr. Moulton.*

For respondent there was a brief with oral arguments by *Mr. Wallace McCamant, Mr. Charles J. Schnabel* and *Mr. J. B. Ofner.*

BENNETT, J.—Appellant's first assignment of error has reference to the ruling of the court, permitting a witness to testify to a talk she had with plaintiff's wife, concerning which the witness stated:

"Well, in several ways she generally used to speak in regard to her husband, and she always spoke very

well of Mr. Schneider, and that they got along very happily together.''

We do not think there was any error in the ruling of the court upon this question. It is well settled that, in a case of this kind, the plaintiff is permitted to show the declarations of his or her spouse, while they were living together, or about the time of their separation, where such declarations tend to disclose the relations of the husband and wife, and the feelings and motives of the husband or wife, whose affections are alleged to have been alienated: *Hilliers* v. *Taylor,* 116 Md. 165 (81 Atl. 286); *Nevins* v. *Nevins,* 68 Kan. 413 (75 Pac. 492); *Tucker* v. *Tucker,* 74 Miss. 93 (19 South. 955, 32 L. R. A. 623); *Bailey* v. *Bailey,* 94 Iowa, 598 (63 N. W. 341); *Knapp* v. *Wing,* 72 Vt. 334 (47 Atl. 1075).

1, 2. The second assignment of error refers to the ruling of the court regarding the wife's statement, in the absence of the defendant, as to the matter of an abortion, just previous to her leaving home, to which the witness had testified as follows:

''Yes, when I went to work for Mrs. Mary Schneider, she was sick, and I asked her what was the matter. She told me she had went and had an abortion performed. I said she should not do it, and she said, 'Well, I don't want any more children. My husband, Jake Schneider, I told him so and I asked for money to go to the doctors and he refused to give me any at all.' She said 'I went to papa and told him and *he gave me the money and told me to go.*' ''

To this the counsel for defendant objected, as follows:

''I object to what Mrs. Schneider told this woman, Tapfer told her. That is clearly hearsay evidence.''

''The Court: I am inclined to think so.''

"Counsel for defendant: The objection is, that this witness is endeavoring to testify to declarations made by Mary Schneider to her, regarding conversations which she claims Mr. Tapfer had with his daughter upon matters which do not touch upon motives in this suit at all. It does not touch upon the marital happiness of these parties."

"The Court: The objection is well taken."

"Attorney for defendant: I would like to ask that the jury be instructed to disregard that."

"The Court: I will take that up later. It may be this testimony will be admissible."

However, the court did not take this up again and the testimony was permitted to stand.

In the refusal or neglect of the court to instruct the jury to disregard this evidence, there was clearly error, if the appellant is in position to take advantage of the same. The testimony did not in any way tend to show a happy married relationship between plaintiff and his wife, or to show her state of mind in regard to leaving the plaintiff, or that her father had anything to do with that state of mind.

It was simply evidence which tended to debase and degrade the defendant, by causing the jury to believe he had approved of his daughter's criminal abortion. Evidence could hardly have been offered which was more irrelevant to the issues involved in this case, and certainly none could have been offered, which was more likely to inflame and prejudice the minds of the jury against the defendant. It was utterly incompetent to prove that the defendant had approved the abortion by such hearsay testimony, and even if he did approve it, it was not such an action as had any natural tendency to alienate the wife's affections. The court should, very promptly, and in clear and ex-

plicit words, have instructed the jury to disregard the same.

We say this, in view of the new trial of the cause; although it is doubtful, if the appellant made such exception to the action of the court, as to be in a position to take advantage of the error here.

3. The third assignment of error pertains to a conversation about which plaintiff himself was testifying, which was supposed to have taken place before the marriage of plaintiff and his wife. Plaintiff, having testified that he had a conversation with his wife, was asked:

"Q. What was said there?
"A. Well, she told me all about it."

Here counsel objected:

"I object to that, what was said. Mr. Tapfer was not there and I object to that as incompetent testimony and hearsay evidence. He was not present and what she told him is not admissible.

"The Court: I think it is admissible under the first former ruling that the court made." To this ruling there was an exception—"and she answered, 'She told me her father and mother wanted her to quit altogether. She said she wouldn't do it.' We were talking around there for quite awhile and I left again."

We think the court erred in admitting this testimony. It was hearsay testimony. The declarations of plaintiff's wife, in regard to her father's supposed feelings, before they were married. It certainly did not tend to show happy married relations between plaintiff and his wife, or to throw light upon her motive in leaving him four or five years afterward. It was a mere narrative of her father's feelings toward plaintiff before they were married, evidently offered for the purpose of showing, that he might be *likely* to

interfere with the relations of plaintiff with his wife after they were married, and thereby to strengthen the inference, that he *had* interfered with her relations and affections, when she finally did leave her husband, four years afterwards. The testimony was hearsay and incompetent.

4, 5. In this connection, as the case will go back for another trial and these questions will all arise again, it may be proper to define what the rule is in a case of this kind as to the declarations of the alienated spouse in the absence of the defendant.

Such declarations, when made prior to the alienation, are always admissible, when they tend to disclose affection and the relations between the spouses. As for instance, if he or she should say to the other, "I love you devotedly," or "We are very happy together." Such declarations are also admissible when they are made at, or approximately before, the alienation, where they are of a character likely to disclose the mind and motive of the alienated one, and the effect upon his or her mind or motive, which the supposed words or conduct of the defendant has had. To illustrate, if a wife should say to her husband, being about to leave him,

"I can't live with you any longer. My father does not want me to, and he has said so much it has caused me to dislike you. He says if I continue to live with you he will disinherit me, and I can't give up my heritage in that way."

Such a declaration would be admissible; not, of course, for the purpose of showing that her father really had said those things, but for the purpose of showing that the acts of her father (which must be proven by other evidence) had affected *her* mind, alienated her affections, and caused her to leave her

husband. Sometimes such declarations may be admissible, when accompanying the act of leaving, as a part of the *res gestae* of the act. This is the general effect of the authorities cited in respondent's brief upon this branch of the case.

6. But where the declarations are *not of a character which bear upon the mental state or motives of the alienated spouse,* and where they are unaccompanied by any declarations upon her part which do bear upon her mind or motive, they are wholly inadmissible: *Westlake* v. *Westlake,* 34 Ohio, 634 (32 Am. Rep. 397); *Brison* v. *McKellop,* 41 Okl. 379 (138 Pac. 154); *Cochran* v. *Cochran,* 196 N. Y. 91 (89 N. E. 470, 17 Ann. Cas. 782, 24 L. R. A. (N. S.) 160); *Magers* v. *Magers,* 143 Iowa, 750 (123 N. W. 330); *Miller* v. *Miller,* 154 Iowa, 344 (134 N. W. 1058); *Phelps* v. *Bergers,* 92 Neb. 855 (139 N. W. 632).

In *Westlake* v. *Westlake,* 34 Ohio, 634 (32 Am. Rep. 397), the court said:

"Did the court err in permitting the declaration of the husband made in the absence of the defendant, to the plaintiff, that the defendant was doing all he could to bring about a separation between the plaintiff and her husband? We think it did. This was clearly hearsay testimony and nothing else. In an action for enticing away the plaintiff's wife the declarations of the wife are not admissible in evidence."

In *Brison* v. *McKellop,* 41 Okl. 379 (138 Pac. 154), the action was brought by the wife against her husband's mother, and the court said:

"The plaintiff was permitted, over the objections of the defendant, to state what her husband had told her that his mother had said to him such statements having been made some three months after the separation between plaintiff and her husband, and in the absence of either of defendants: * * The testimony of plain-

tiff herself, which was duly excepted to, was clearly incompetent and decidedly prejudicial to the rights of defendants.''

In *Magers* v. *Magers*, 143 Iowa, 750 (123 N. W. 330), it is said:

"The plaintiff was permitted to testify that her husband told her the defendant had asked him to put plaintiff in a sanitarium, and had employed Dr. Taft to take her there. The testimony was clearly hearsay, and not admissible under any authority. It was no part of the *res gestae,* nor did it in any way indicate the mental attitude of T. F. Magers towards the plaintiff. That all of the testimony which we have quoted was extremely prejudicial to the defendant is at once apparent.''

In *Cochran* v. *Cochran,* 196 N. Y. 86, 91 (89 N. E. 470, 472, 24 L. R. A. (N. S.) 160, 17 Ann. Cas. 782), it is said:

"On the strength of these rulings, and without unnecessary repetition of similar objections which defendants' counsel had the right to assume would be overruled, the plaintiff was allowed to give other testimony of statements made by her husband, with reference to the hostile attitude and disposition of his parents.

"We think it is unnecessary to take time for the purpose of arguing that this evidence was very prejudicial to the defendants, and we know of no authority which justified its introduction. While of course plaintiff was required to prove the unlawful conduct of defendants, and while such unlawful conduct might be evidenced by such acts as were outlined in the evidence referred to, it was incumbent upon her to prove the same by competent testimony, and it was not proper to give evidence of her husband's declarations on the subject. Such evidence offended against the general rules of evidence and has been specifically condemned in actions similar to this one: *Huling* v. *Hul-*

*ing,* 32 Ill. App. 519; *White* v. *Ross,* 47 Mich. 172 (10
N. W. 188); *Preston* v. *Bowers,* 13 Ohio St. 1 (82 Am.
Dec. 430); *Manwarren* v. *Mason,* 79 Hun, 592 (29 N Y.
Supp. 915)."

The cases cited in the brief of the learned attorneys
for respondent, except the case of *White* v. *White,* 140
Wis. 538 (122 N. W. 1051, 133 Am. St. Rep. 1100),
appear to be cases where the particular declaration of
the alienated spouse, was of such a character, as to
throw light upon her own conduct and feelings.    The
case of *White* v. *White* seems to disregard this distinc-
tion, and to sustain the admissibility of such declara-
tions, even where they have no reference whatever to
the state of mind of the husband or wife making the
same.    We cannot follow the doctrine of that case.    It
is in direct conflict with the decisions we have already
quoted, from Ohio, Oklahoma, Iowa, Nebraska and
New York, and, as we view it, is contrary to the gen-
eral and well-established principles of evidence.

Such declarations of the alienated spouse are hear-
say in their nature, and are a very dangerous char-
acter of evidence, and should only be admitted, when
they clearly bear upon the relations of husband and
wife, or on the motives and mental condition of the
alienated spouse, and then the court should clearly
inform the jury that they were admitted for that pur-
pose only.

7. The fourth and fifth specifications of error, refer
to the introduction of the judgment-roll of the action,
brought by the defendant against the plaintiff and his
wife, to recover the sum of $846 upon a promissory
note, and the judgment-roll in the action of replevin
brought by defendant against plaintiff, to recover the
possession of certain property under the mortgage.

Each of these were introduced over the objection of the defendant, that they were incompetent, irrelevant and immaterial. In this we think there was error. They were offered apparently for the purpose of showing malice upon the part of the defendant, and that he was engaged in a general scheme to bring about plaintiff's ruin.

At the time of the objection the purpose was stated by one of the attorneys for plaintiff, as follows:

"We have made an allegation that he was trying to prejudice this boy in the eyes of his wife by bringing about his financial ruin, and the defendant has alleged that he had a very fatherly interest in this young man and his welfare, and we wish to introduce these records for the purpose of enabling the jury to determine just what that fatherly interest consisted in."

The court seems at first to have thought these records not admissible, but finally admitted them, and exceptions were taken.

Both of these actions were brought after plaintiff's wife had refused to live with him, and had gone to live with her father, and after she had brought her action for divorce against the plaintiff. Both of them were apparently properly brought, for it is admitted and the record shows that in each the defendant herein prevailed and obtained judgment.

It is questionable, if the prosecution of an admittedly just claim can ever be made evidence of malice, but at all events in this case, these proceedings were too remote. They have no reference or direct connection with this proceeding, and were brought after the culmination of the acts complained of in plaintiff's complaint.

In *Stamper* v. *Raymond,* 38 Or. 16, 30 (62 Pac. 20, 24), the action was for malicious prosecution. The

court had permitted the introduction of evidence as to a previous controversy and trouble, a year or more previous to the transaction in question, and the court held this was error.

Judge WOLVERTON, delivering the opinion of the court, said:

"These negotiations and transactions may have had the tendency to show malice on the part of Raymond against Stamper, but they involved a further inquiry as to who was in the right during their pendency, as, *if Raymond was in the right, malice could not be imputed to him from the mere instituting* of the civil proceedings alluded to. * * In the endeavor to show malice in cases of this nature, large latitude is usually indulged; but it is necessary that the inquiry should have some perceptible relation to the controversy which led directly to the alleged malicious prosecution—some connected bearing—so that it can be said that the malice which induced the one, or was manifested thereby, has been harbored for a new opportunity to arise, whereby he may again give rein to such impulse, prompted by a perpetuation of the same motive, and that the present was the opportunity for which he had been seeking. It does not seem to us that such an inference is reasonably deducible from the premises. The transaction of 1898 appears to have been closed by the discharge of the attachment and a dismissal of the suit for a receivership, and had remained closed, for aught that appears, for nearly a whole year, and until another crop had been produced, to which the new conditions wholly related. Under such circumstances, we are of the opinion that the transactions of 1898, and prior thereto, *were too remote and disconnected to be relevant for the purpose of showing malice in the transactions concerning the crop of 1899, and should not have been allowed, for that reason, to go to the jury.*"

In *McLain* v. *Burdette,* 174 Ky. 592, 596 (192 S. W. 648, 649), there was an attempt to introduce a threat-

ening letter written by the defendant to the plaintiff, and the court said:

"The cause of action relied on by plaintiff was the alienation by the defendants of the affections of his wife, and to this cause of action the evidence, as well as the instructions, should have been confined. If Mrs. Burdette wrote to McLain a threatening letter, this might furnish the basis of a prosecution against her, or possibly ground for a civil action in his behalf, but we do not understand how a threatening letter written to him could have operated to alienate the affections of his wife."

In *Allcock* v. *Allcock*, 174 Ky. 665, 670 (192 S. W. 853, 855), there was an action for alienation by the wife against the husband's mother, and there was an attempt to show that the mother-in-law, defendant, had tried to force the plaintiff and her husband, to give her a deed or mortgage on their residence property, and that in the conversation, at which all three were present, the husband had said to the plaintiff if they did not give the mortgage, his mother would put them out of the house. The court said:

"The presumption is authorized that appellant's husband was owing his mother, as claimed by the latter, and, if so, her request for the mortgage as security for the debt *was what she, as a creditor, had the right to demand under the circumstances.* In this view of the matter, we are unable to perceive how the transaction circumstantially tends, even in the remotest degree, to show, as claimed by appellant's counsel, any purpose on the part of appellee, to create dissension between her son and his wife, or a malicious intent on her part to alienate his affections from the wife."

It is true that the mere fact of litigation between two parties, pending at the time of the principal transaction, or immediately before, is sometimes admissible

to prove malice or hatred, without regard to the justice of the claims on one side or the other.   This is not because such litigation, where the claim of the party in question is just, is proof of any *previous* malice, but because, according to the laws of human nature, the fact of such controversy in the courts, is, of itself, *likely to produce more or less dislike*, on both sides, and, therefore, such prior or impending litigation, bears upon the probability of present malice or motive.

In the same way in a case of homicide, the state may generally show *previous* controversies and altercations, even though the defendant may have been entirely in the right, and may even have been wantonly assaulted by the other party, in the previous controversy.   But no one would suggest that in an assault and battery case, a *subsequent* controversy, where the defendant had been assaulted, and was entirely in the right, could be introduced.   It would not then tend to show motive on the part of defendant for the previous assault.

The cases cited by appellant are all cases where the litigation was pending at the time of the principal event, or was prior thereto, and generally they are cases where the previous litigation had some direct connection with the controversy involved.

*Murphy* v. *People,* 63 N. Y. 591, involved a charge of murder—the witness was wounded by the same shot which killed deceased—and it was a theory of the state that the shooting was directed toward him, and the killing of the other party an accident—the previous suit about which evidence was offered was to set aside deeds *to the witness* from his wife (defendant's sister).   The suit was actually pending at the time of the homicide and was to come up for trial the *ensuing*

*Monday.* Of course the evidence was clearly admissible to show motive.

*Turner* v. *State,* 33 Tex. Cr. R. 103 (25 S. W. 635), was also a murder case, and the proceeding about which evidence was offered was an injunction suit brought by deceased against defendant, which was *then pending* at the time of the homicide, and the evidence was admitted to show probable. feeling and *animus.*

The case of *Clark* v. *Folkers,* 1 Neb. (Unof.) 96 (95 N. W. 328), was for malicious prosecution, and the suits in relation to which evidence was offered. were brought between the parties, just prior to the prosecution in question, and were then pending.

*State* v. *Zellers,* 7 N. J. Law, 220, was a murder case at *nisi prius.* The lawsuits, about which evidence was introduced, were prior to the murder and were in relation to the same land the parties were quarreling about at the time of the killing.

None of these cases are authority, for the admission of the record in subsequent cases, brought by the defendant upon debts which are conceded to have been justly and actually due, from the plaintiff to the defendant at the time.

It is true that the bringing of these other lawsuits, was pleaded in the complaint of the plaintiff, and it is urged that they became material for that reason, but we do not think this fact affects the question. The allegation in the pleading was mere surplusage. The plaintiff's action was for alienation of affection, and not for the malicious prosecution of civil suits, and if the plaintiff could have joined the two together, it would have been necessary to have alleged that the litigations in question were unjustly brought. This

was not done and it is conceded that no such allegation could have been truthfully made.

It is also urged that the alienation of Mrs. Schneider's affections was a continuing operation, and was not finally completed, until after the commencement of the litigations offered in evidence. And to support this theory respondent refers to the following clause in the complaint:

"And since said time, acting under the wrongful, unlawful, and malicious advice, direction and influence of the defendant, the wife has wholly refused to recognize the plaintiff as her husband, or live with him, and has refused and *now refuses* to return to plaintiff's home."

But this allegation follows immediately after the allegation, that—

"During September, 1916, and for a long time prior thereto, the defendant wrongfully contriving and unjustly contending * * did so prejudice and poison the mind of the wife against plaintiff, and so *alienate her love and affection* from the plaintiff, that the wife, acting upon the wrongful and malicious advice and under the direction of the defendant, did, *during September, 1916*, leave the plaintiff and his home and returned to the home of defendant."

Under these allegations we think it is apparent that the alienation must be considered as having occurred in September, or at least not later than the commencement of the divorce proceedings, which was October 3d. The litigations offered in evidence were commenced October 25th and November 20th respectively.

Besides, there is not the slightest intimation in the testimony, either direct or circumstantial, that the defendant ever did anything, or said any word, toward alienating the wife's affections, after October 25th, the

date of commencing the first of these litigations. We think, therefore, these litigations commenced October 25th and November 20th, could not have furnished any motive for alienating the affections of plaintiff's wife in the September before.

The case of *Tucker* v. *Tucker,* 74 Miss. 93 (19 South. 955, 32 L. R. A. 623), is cited by respondent, for the proposition that statements of the defendant, made after the alienation, may be admissible to show motive. That case does not seem to be very fully reported, and it does not appear just what the subsequent statements of the defendant were.

Of course it is obvious that a party might make subsequent statements, which would be of such a character as to go back and tend to show what his feelings and motives were, prior to the alleged alienation. But we think the bringing of a litigation, subsequent to the alienation of the wife's affections, by the defendant upon a claim which is then legally due, is not admissible.

There is one other very important question involved in this appeal, namely: whether or not there was any evidence of any interference on the part of the defendant, which might have alienated the affections of plaintiff's wife.

8. The defendant was the father of plaintiff's wife, and it is elementary in cases of this kind that there are two distinct elements of the wrong, which plaintiff must prove, before he is entitled to recover. First: That the defendant *did actually alienate* the affections of the plaintiff's spouse, and, second, that his action was malicious—that is, intended to injure the plaintiff and being calculated to bring about the alienation.

9. There was evidence offered on behalf of plaintiff, tending to show a dislike toward him on the part of the defendant, and while the evidence is very conflicting as to that, the jury may have concluded that he had such a dislike toward the plaintiff, as would justify a finding of malice. If it had been proven that he actually did *alienate his daughter's affections from her husband,* and there being evidence of malice, the verdict of the jury would be binding upon us. We would have no right to review its findings upon the weight of the evidence. But the close question is, whether there was any competent legal evidence, that the defendant did actually interfere wrongfully between plaintiff and his wife, and thus bring about the alienation.

The plaintiff's married life with defendant's daughter had been a more or less troubled and tumultuous one. Starting out with an elopement, brought about by their mutual indiscretions, the young couple went first to Denver, Colorado, where the plaintiff worked at such employment as he could obtain. After living there about five months they returned to the Pacific Coast and worked around for a year or two. Part of the time they were working at different places, the wife being engaged as a domestic, while the husband worked from place to place. Part of this time their oldest child was left in a baby home near Portland. Afterwards they worked for about a year for the wife's father (defendant herein). Then plaintiff engaged in a dairy business for himself and was operating said business at the date of the separation involved in this action.

The wife testifies that their life together was a constant succession of quarrels; that plaintiff was jealous of other men, and frequently accused her of being too

friendly with such men; that he was uncleanly in his person, brutal in his sexual desires, and required her to work constantly at hard manual labor. Most of this is disputed by the plaintiff, who testified that they generally got along well together, and in this he is corroborated, to some extent, by the testimony of other witnesses. However, he admits they had trouble a year or two before, at a time when he claims to have found her kissing a tramp whom he had employed, and that about three or four months afterward, they had another quarrel over this same man, and she left him and went home to her father and mother and stayed until her mother, at his request, made her go back to him. He also admits that shortly before she left the last time, he had some disagreement with her about the abortion which she had, or was about to have, performed.

We find no direct evidence in the record of any action or word, on the part of the defendant, directed toward inducing plaintiff's wife to leave him, or diverting her affections. The only direct evidence is that of plaintiff's wife and her father and stepmother, and that is to the negative. The wife testifies, in relation to the final trouble, that she had gone to a lawyer to see about a divorce in February before.

"I had simply got utterly disgusted and tired of his everlasting quarreling and his disposition and actions towards me, and I felt I couldn't stand it any longer.

"Q. But you did not leave him at that time?

"A. No, sir; on your advice I went back to him again.

"Q. Why did you leave him the last time?

"A. Because he had gotten me into the family way, and I had an abortion performed, and he had called me a murderess, and treated me without any consideration whatever, and he demanded me to work just as

hard after that operation, as when I was in perfect health, and I was so worn down and run down and sick, that I couldn't stand it to live with him any longer, and that was the reason I left.

"Q. Why did you have that operation performed?

"A. Because I felt we could not live our lives out together, and I thought it would be a sin to bring another child into the world, in the way we were living, and that the best thing to do would be to have an operation performed. Two children in such an unhappy family was the greatest plenty. * *

"Q. Did your father have anything to do with it?

"A. Nothing at all."

The defendant himself testified that he had nothing to do with his daughter's leaving and coming home; that he was about to be married again and that he was afraid it might make trouble at his own home if she came there.

"Q. What action, if any, did you take to have Mary come out to your place?

"A. I did not take any. She asked me if she could come out to my place. * * She said, 'Papa, I have got a good mind to go out with you' and I said 'You can if you want to.'

"Q. Was Mr. Schneider there?

"A. He certainly was. I was sitting right in his presence. He asked me (afterwards) to ask his wife to come back to him, which I certainly did, even before he ever came out and after I found out what the girl had done and what her intentions were. * *

"Q. Why did you want your daughter to come (back)?

"A. Well, because I didn't think it was right in the first place on account of the children, and in the second place in the position I was in. I was engaged to be married and I did not think it was right for her to come in with a stepmother. It is no place for two women under one roof."

And the testimony of Mrs. Tapfer is to the same effect.

If there is any evidence to the contrary it is purely circumstantial. However, circumstantial evidence is sufficient to establish this, or any other fact, providing the circumstances point in that direction and are sufficient, so a reasonable man *might* reason from such circumstances and justly reach that conclusion.

The circumstances relied upon by the plaintiff, to prove that the defendant actually did interfere, are: First, that he was present at plaintiff's home the day before plaintiff's wife left; second, that he had talked with her in German at that time; third, that he then invited the wife to visit him at his home and to bring her two children; fourth, that about that time he gave her $20 to pay on the doctor's bill on account of her abortion; fifth, that the wife went with him to his home and remained there; sixth, that afterward the litigations were brought by the defendant, to which we have already referred; seventh, that the wife told her husband, and others, that the defendant had threatened to disinherit her if she continued to live with plaintiff; eighth, that the wife had told the plaintiff, and others, that her father knew about the abortion and, in substance, approved of the same; ninth, that at one time when plaintiff went over to defendant's home to see his wife, defendant told him she had gone to town, and that she herself afterwards told plaintiff that she had *not* gone to town, but was working at another place about one and a half miles from her father's house.

All of the circumstances and matters in relation to the abortion may be eliminated, first, because there is no proof whatever that the defendant ever knew anything about the proposed abortion until *after* it was

performed, except the alleged statements of his daughter in his absence, which statements, as we have already seen, were hearsay and entirely incompetent to connect him with the operation. The fact, testified to by one witness, that after the abortion he gave his daughter $20 to pay the doctor's fee, assuming that he did do so (which both of them deny), would not prove that he had knowledge of the abortion *before* it occurred. A father—finding his daughter in that condition and owing for her medical care, might well contribute toward such a payment without having any previous knowledge of the occurrence; second, because, as we have already said, even if he had knowledge and approved of the abortion—however wrong it might be—it did not tend toward the alienation of Mrs. Schneider's affections. It might possibly have tended to alienate the husband's affections from her, but that could not be the cause of complaint in this action.

We must also eliminate all of the circumstances that depend alone upon the hearsay evidence or statements of plaintiff's wife in the absence of the defendant. This includes the alleged statements of the defendant about disinheriting his daughter, which were not proven by other evidence. It also eliminates the claim, that the defendant's statement to plaintiff "that his wife had gone to town" was false. The only evidence of this falsity was the unsworn statement of plaintiff's wife, which was purely narrative and clearly hearsay and entirely incompetent against the defendant.

For the reasons which we have already stated in this opinion upon another point, the evidence as to the subsequent litigations, must also be disregarded.

The only circumstances left and the only competent facts which can be considered as tending to prove that

the defendant did any act, or said anything, to alienate the affections of his daughter from her husband, is the fact that he was present at plaintiff's home the day before plaintiff's wife left; that there was an arrangement for her to come over to his home, and that he then invited her to bring her little girl along; that about that time he had a conversation with plaintiff's wife in German, and that she did not return to her husband, but remained in the defendant's home. This may be evidence sufficient to raise a suspicion in one's mind, or to suggest a possibility of the defendant's culpability, but it does not seem to us any *proof* that the daughter left upon his persuasion.

There is no evidence whatever that she had informed her father at that time that she was about to leave the defendant permanently. On the contrary, she told the woman who was there and who was a witness for the plaintiff that she would be back in about a week or ten days—in time to take care of some fruit she was about to put up. Her husband testified himself that he knew of the proposed visit to her father and made no objection—indeed, he was perfectly willing she should go and expected her to return in a few days. The fact that defendant invited her to bring the child (his grandchild) was not an unnatural thing, and is just as consistent with the grandfather's natural feeling as it is with any culpable intention.

Neither is the talk in German in the presence of the witness, who was apparently almost a stranger to defendant, of any special significance. What the talk was about does not appear. It may have been in relation to the abortion which his daughter had suffered. At any rate there are many things which a father and daughter do not care to discuss in the presence of a

stranger, and the fact that they go aside to talk by themselves, or talk in a different language, where it happens to be one familiar to them, can hardly be accepted as *proof* of guilty motive or conduct. As we have said before, the most that can fairly be claimed under these circumstances, is that they suggest a suspicion that the defendant *might possibly* have influenced his daughter.

It is urged, however, that this was *some evidence* in the case and, therefore, that the verdict of the jury is conclusive and cannot be disturbed under the constitutional amendment to Article VII of the State Constitution adopted in 1910. Section 3 of that amendment provides:

"No fact tried by a jury shall be otherwise reexamined in any court of this state, unless the court can affirmatively say there is no evidence to support the verdict."

This amendment has been frequently before this court and has been uniformly construed as prohibiting the trial court, or this court, from interfering with the verdict of a jury, where the evidence was conflicting, or where there was no conflict but there was substantial evidence upon which the jury could reasonably find the verdict in question: *Consor* v. *Andrew,* 61 Or. 483 (123 Pac. 46); *Forrest* v. *Portland Ry. L. & P. Co.,* 64 Or. 240 (129 Pac. 1048); *Buchanan* v. *Hicks,* 66 Or. 503 (133 Pac. 780, 134 Pac. 1191); *Saxton* v. *Barber,* 71 Or. 230 (139 Pac. 334); *Martina* v. *Oregon-Wash. R. & N. Co.,* 73 Or. 283 (144 Pac. 104); *Sink* v. *Allen,* 79 Or. 78 (154 Pac. 415).

The court has seldom been called upon to pass upon the question of whether or not, under the constitutional provision, evidence to raise only a suspicion or

conjecture, would prohibit the court from setting aside a verdict.

We think, however, the constitutional provision did not intend to go further than to prohibit the court from reweighing the evidence and revising the verdict of the jury in cases where there was conflicting evidence, or substantial evidence, to sustain the verdict.

In *Martina* v. *Oregon-Wash. R. & N. Co.*, 73 Or. 283 (144 Pac. 104), Mr. Justice RAMSEY, delivering the opinion of the court, said:

"In order that a verdict may be supported 'by the evidence, there must be some legal evidence tending to prove every material fact in issue."

In *Consor* v. *Andrew*, 61 Or. 483 (123 Pac. 46), there was a proceeding against the administrator of an estate, and under the law it was necessary that the evidence of the plaintiff should be corroborated. The only corroboration was certain letters, and it was claimed that an inference could be drawn from these letters corroborating the evidence of the plaintiff, and therefore, the verdict could not be disturbed. Mr. Justice MOORE, delivering the opinion of the court, said:

"An inference is a species of evidence, but it is believed that the clause of the fundamental law referred to, requires a greater degree of proof than is afforded by such indirect probative matter. In our opinion there was 'no evidence,' within the meaning of that phrase, as used in the amendment of the constitution, adequate to support the verdict, and, this being so, judgment cannot be affirmed on the legal principle invoked."

Previous to the amendment it had been the practice of the courts to reweigh the evidence, which had been presented before a jury, and set aside the verdict if the

court deemed the verdict clearly against the *weight* of the evidence.

In *Serles* v. *Serles,* 35 Or. 289, 293 (57 Pac. 634, 635), the court said:

"In passing upon the sufficiency of the evidence to support the verdict, the trial court is authorized to weigh and consider all the evidence which has been submitted to the jury; and if it is ascertained that the verdict is *against* the *clear weight thereof,* or is one that is manifestly unjust, or that reasonable men would not adopt or return, to set it aside and grant a new trial."

And this opinion had been followed in later cases. This doctrine had been especially applied as to the revision of verdicts assessing damages. The object of the constitutional provision was clearly to prohibit this practice.

In *Buchanan* v. *Hicks,* 66 Or. 503 (133 Pac. 780, 134 Pac. 1191), Mr. Justice MOORE, delivering the opinion of the court, said:

"It has been the practice of many trial courts in Oregon, prior to the amendment of the organic law, parts of which have been quoted, to set aside judgments and grant new trials, when, from a consideration of all the evidence given at the trial of an action, it was believed the verdict was excessive. In order to inhibit such practice and to uphold verdicts, the Constitution was amended so as to preclude a court from re-examining any fact that had been tried by a jury, when the verdict returned was based on any legal evidence."

We do not think the constitutional amendment intended to go any further than this, or to prohibit the court from setting aside a verdict where the evidence was only sufficient to raise a suspicion or conjecture. It must be remembered that under the constitutional

provision it is not "any evidence" which prevents the interference of the court, but any evidence *"to support the verdict."*

This is substantially the conclusion announced by Mr. Justice Ramsey in *Sullivan* v. *Wakefield,* 65 Or. 528 (133 Pac. 641).

It is obvious that in many cases there may be some evidence, and even evidence which is competent and material and entirely admissible, and yet it may not be sufficient to support a verdict. In criminal cases, evidence of motive, for the commission of a crime, is always competent and admissible, so of course is evidence that *somebody* had committed the crime in question; and yet it would hardly be contended that evidence of motive on the one hand, and that the crime had been committed on the other without more, would support a verdict of guilty. If this were the rule, all that would be necessary to convict any man, where there had been a larceny of money, would be to show that he liked and wanted money and, therefore, had a motive, and most of us could be easily proven to belong to that class.

10. We hold that evidence merely suggesting a suspicion or possibility, does not bring the case within the constitutional amendment, but that there must be substantial evidence upon which a reasonable man *might* reach a reasonable verdict.

There does not seem to be any such evidence in this case, and we must conclude that the verdict was brought about by prejudice, resulting from the incompetent and improper evidence as to the supposed conduct of the defendant in other matters—that he had dealt harshly with the plaintiff in the matter of foreclosing the mortgage and suing upon the note, and

that he had, perhaps, approved of his daughter's abortion—and by their consideration of the incompetent hearsay evidence as to what the daughter is claimed to have said her father told her.

Cases of this kind are altogether different from the ordinary suit for alienation of affections, where an outsider has wantonly interfered with the marriage relation for selfish purposes of his own. The parents of a married daughter are close to her by blood and affection; they are bound to support her by every tie, both legal and ethical; they cannot inquire first whether she is right, in a controversy with her husband, and turn her out and disregard her if she is wrong. Their home is her home, and if they are right thinking people it must continue to be so whatever she does or wherever she goes. Their doors must open to her cheerfully and willingly when she is in trouble, without regard to who is at fault or who has brought it about. To say that, because they have performed this duty and brought their daughter back to their hearthstone when she could no longer get along with her husband, a presumption may be raised against them, or an inference sustained, by which they should be, upon such facts alone, heavily mulcted in damages, would be as unfair and unjust as it would be contrary to good public policy.

Of course, there may be, and no doubt there are, cases where the parents have wickedly interfered, from spiteful and malignant motives, and in such cases they should be held liable for their wrong, but before a verdict against a parent can be sustained, it must be proven by direct or circumstantial evidence, that the parent actually did persuade or induce the alienation complained of.

We think there is no case in existence, in which a verdict against a parent has been sustained, where the competent evidence was so shadowy and conjectural, as in this case.

The case of *Price* v. *Price,* 91 Iowa, 693 (60 N. W. 202, 51 Am. St. Rep. 360, 29 L. R. A. 150), is probably the strongest case that can be cited to sustain such a verdict, and in that case the evidence was very much stronger than here. In summing up the court said:

"He stated that he [the defendant] thought the plaintiff and George should separate; that it would be better if George were free for in that case he would have a part of the estate, as he did not intend that any of his money should go outside of his family. For several months after their marriage George lived a part of the time with plaintiff and her mother, and a part of the time with defendants. He worked for several different families and persons and contributed some to the support of plaintiff; but he did not remain long with any one employer. *The defendants were active during that time in trying to induce him to leave the plaintiff.* * * For about a month after he left Des Moines the plaintiff did not hear from him or know where he was and when she applied to defendants for information, they professed to be as ignorant as she was in regard to him, although they corresponded with him and knew where he was and what he was doing. * * During the first part of the time they were in Keokuk, George was kind and affectionate to the plaintiff and they lived happy together. He received letters from the defendant during that time and finally received one which the plaintiff did not read. When that was received George told the plaintiff he was going to leave her, as the defendants wished him to."

It must be assumed that all of these facts were proven by competent testimony, and if so, it is plain without further analysis, that the evidence was infinitely stronger than here.

*Stanley* v. *Stanley,* 27 Wash. 570 (68 Pac. 187), was a suit by the wife against her husband's father and mother. There was testimony tending to show that the mother had been active in causing the separation, but the only evidence that the father had taken part in the matter was that he, as well as his wife, had made statements to the effect that if their son should return to live with respondent, they would disinherit him, and that the father and mother had joined in employing an attorney to procure for their son a divorce from respondent. The court ordered a nonsuit as to the father, saying:

"There is a wide distinction between an action by husband or wife against the parent of either and one against some stranger, who invades the domestic circle and separates husband and wife. * * * The most the evidence shows against him is, that he did not desire his son to live with respondent, and employed an attorney to obtain a divorce from her, and said he would disinherit his son if he returned to live with respondent, but it is not shown that this was communicated to the son, or that the son did not request him to employ the attorney for the purpose of procuring the divorce. There is no evidence in the case supporting the allegations against him."

In *Pooley* v. *Dutton,* 165 Iowa, 745, 754 (147 N. W. 154, 157), the court quotes with approval from a previous decision of Chancellor Kent, as follows:

"A father's house is always open to his children; and, whether they be married or unmarried, it is still to them a refuge from evil and a consolation in distress. Natural affection establishes and consecrates this asylum. The father is under even a legal obligation to maintain his children and grandchildren, if he be competent, and they unable to maintain themselves; and, according to Lord Coke, it is 'nature's profession to assist, maintain, and console the child.' I

should require, therefore, more proof to sustain the action against the father than against a stranger. It ought to appear either that he detains the wife against her will, or that he entices her away from her husband, from improper motives.''

It is urged on behalf of respondent that there were some general statements on the part of plaintiff in his testimony, which are assumed to have been based on probative facts, and which, therefore, it is urged we should consider as evidence in the case. In one place plaintiff testified:

"Q. Now you said yesterday you got along all right, but somebody else was always butting in.

"A. Yes, sir.

"Q. Who was that somebody else?

"A. Her folks.

"Q. Just say who they were; all her folks?

"A. No, I believe it wasn't all her folks. I know it was them Zumwalts and it was her father.

"Q. Zumwalts and the father?

"A. Yes, sir."

We can hardly consider this as anything more than a general statement of a conclusion of the witness. However, in view of all the circumstances, we think the case should go back for a new trial instead of being arbitrarily dismissed, when, if there are any facts which were not disclosed by the evidence, and to which plaintiff had reference in these general statements, he can have an opportunity, if he desires, to fully present them.

Reversed and remanded for a new trial.

REVERSED AND REMANDED. REHEARING DENIED.

HARRIS, J.—I concur in all that Mr. Justice BEN-NETT says concerning the incompetency of (1) the statement of Mary Schneider referred to in the second

assignment of error; (2) the statement made by Mary
Schneider to the plaintiff before marriage to the effect
that her father and mother wanted her "to quit" the
plaintiff; (3) the judgment-roll in the action of re-
plevin and the judgment-roll in the action which was
brought on the promissory note. I agree also with
the conclusion that the judgment should be reversed
and the cause remanded for a new trial. I acquiesce,
too, in the announcement that a verdict cannot be per-
mitted to stand if the evidence offered in support of it
does no more than to raise a suspicion. I am unable,
however, to assent to the view that the competent evi-
dence appearing in the record is insufficient to raise
more than a suspicion or conjecture.

If the opinions of Mr. Justice BEAN and Mr. Justice
BENNETT are taken together it will be found that sub-
stantially all the important evidence appearing in the
record is found in one or both of those opinions. If
we first eliminate the incompetent evidence specified
in assignments of error 2, 3, 4 and 5 and again read the
two opinions, stripped of such incompetent evidence,
there will yet remain, as the writer views it, sufficient
evidence to entitle the plaintiff to go to the jury and
enough evidence to sustain and support a verdict for
the plaintiff. In other words, I think that the compe-
tent evidence, when considered as a whole, is sufficient,
if the jury believes it, to raise more than a suspicion
and that its combined strength is enough to sustain
and support a verdict for the plaintiff, and conse-
quently is enough to entitle the plaintiff to have his
cause submitted to a jury. The competent evidence
must be considered in its entirety. If the contention
of the plaintiff is rested upon any one of the several
circumstances relied upon by him and without regard

to the remaining circumstances then there would be room to argue that he was not entitled to go to the jury; but the cause of the plaintiff is not to be judged by any single circumstance segregated and isolated from all else in the record. The case presented by the plaintiff must be measured by all the circumstances viewed as a combined whole. The judgment should be reversed and the cause remanded for a new trial.

Reversed and Remanded. Rehearing Denied.

Benson and Johns, JJ., concur.

BEAN, J., Dissenting.—This is an action by plaintiff Jacob Schneider against defendant George Tapfer for damages for the alienation of the affections of plaintiff's wife Mary Schneider who is the daughter of the defendant.

The gist of the complaint is that plaintiff and Mary Tapfer were married August 1, 1912, and now are husband and wife having two children, the issue of such marriage; that the plaintiff and his wife lived happily together as husband and wife; that during September, 1916, and for a long time prior thereto the defendant wrongfully contriving and intending to injure the plaintiff and to deprive him of the love, comfort, society and assistance of his wife, wrongfully, purposely and maliciously by his conduct and conversation with the wife and by false representations and insinuations so prejudiced and poisoned the mind of the wife against the plaintiff and so alienated her love and affection from the plaintiff that the wife acting on the advice, influence and direction of the defendant did during September, 1916, leave the plaintiff and his home and return to the home of the defendant and has since remained away and refused to return. It is also

alleged that in order to accomplish the above purpose, the defendant induced the plaintiff to purchase the stock and outfit on the Palatine Hill dairy and rent the real estate from the defendant and assume a mortgage held by the defendant and incur other indebtedness to defendant, and that defendant foreclosed the mortgage and took all of the lease and dairy away from the plaintiff.

The answer after admitting the marriage and number of children and denying the remainder of the complaint, affirmatively sets forth that defendant has always acted for plaintiff's welfare; that defendant foreclosed on the dairy to protect his interests and upon the advice of his attorney, all without malice toward the plaintiff, and that—

"Defendant had at all times regarded plaintiff with affection and has at all times attempted to do only such acts as seemed to this defendant to be for the general welfare and benefit and happiness of the plaintiff and his family."

The reply put in issue the new matter of the answer. The cause was tried to the court and a jury and a verdict rendered in favor of plaintiff. Defendant appeals.

BEAN, J.—There are practically two questions presented upon this appeal. Upon the trial the counsel for defendant objected and excepted to the introduction of evidence on the part of plaintiff tending to show statements made by the wife of plaintiff a short time before the separation September 5, 1916, as to the conduct and statements of her father, the defendant, contending that such testimony was merely hearsay. As an example, the plaintiff testified that his wife told him that her father informed her that as long as she

lived with the plaintiff she would receive nothing from her father.

It should be noticed that the issue involved the state of Mary Schneider's mind at and immediately before the time she separated from her husband. This cannot ordinarily be shown by direct proof. It is for the jury to make its inference from the testimony in order to solve a question of fact of this character.

In an action by the husband against his wife's father for the alienation of the wife's affection, declarations of the wife concerning conduct on the part of her parent before the separation, and having reference to her separation from the plaintiff and to inducements held out to the wife to abandon plaintiff are competent for the purpose of showing the mental attitude of the wife, and the cause which promoted the separation, but not as evidence of the truth of the declarations: 13 R. C. L., § 527, p. 1478; 6 Ann. Cas. 664, note; 1 Greenleaf on Ev. (16 ed.), § 162d; 3 Wigmore on Ev., §§ 1729, 1730; *Price* v. *Price,* 91 Iowa, 693, 701 (60 N. W. 202, 51 Am. St. Rep. 360, 29 L. R. A. 150); 21 Cyc., p. 1624; *White* v. *White,* 140 Wis. 538 (122 N. W. 1051, 133 Am. St. Rep. 1100); *Hardwick* v. *Hardwick,* 130 Iowa, 230 (106 N. W. 639); *Williams* v. *Williams,* 20 Colo. 51 (37 Pac. 614); *Nevins* v. *Nevins,* 68 Kan. 410 (75 Pac. 492); *Horner* v. *Yance,* 93 Wis. 352 (67 N. W. 720); *Hillers* v. *Taylor,* 116 Md. 165 (81 Atl. 286).

In the latter case the court said:

"In that respect the defendant's acts and utterances as recited by the spouse are not hearsay, and are admitted, not as evidence of the truth of the statements, but of the mental state and motives of the party making them without reference to the truth of the statements themselves."

To the same effect see: Ann. Cas. 1912C, note at p. 1182; *Preston* v. *Bowers,* 13 Ohio St. 1 (82 Am. Dec. 430); *Saxton* v. *Barber,* 71 Or. 230 (139 Pac. 334). There was no error in admitting the evidence complained of for the purpose of showing the state of mind of Mary Schneider, the wife of plaintiff.

At the proper time counsel for the defendant interposed a motion for a nonsuit and assigns error in the refusal to grant the same, and now contends that the verdict is not supported by any competent evidence. The liability of defendant must be shown by testimony independent of the statements of the wife as to what her father had said and done.

It appears from the record that plaintiff Jacob Schneider was born in Switzerland and came to the United States in 1910, and to Oregon in 1911. He was then nineteen years of age and was engaged to work on the dairy of the defendant Tapfer, on Palatine Hill, and thus became acquainted with Mary Tapfer, defendant's daughter, who was then a year younger. After he was there about five months they fell in love and became indiscreet. Shortly after defendant took another dairy near Vancouver and the plaintiff went there in his employ. Plaintiff on account of a slight dispute quit work in July, 1912, and went back to the old place on Palatine Hill. He received a letter from Mary a few days later and also met her. On August 1, 1912, they were married without the knowledge of her parents. They went to Denver where plaintiff worked on a dairy for five months. They then went to Washington where plaintiff worked on a country-place near Bremerton for three months. About April, 1913, they came to Portland having about $800. Plaintiff worked on a dairy near Scappoose, she did housework in Portland. A little later she saw her parents, and

plaintiff with his wife and baby went to her parents' home near Vancouver where plaintiff worked until September, 1914, when the plaintiff rented a dairy near Holbrook, purchasing the stock. His wife remained with her parents for the first month until the second child, Arnold, was born. The plaintiff was industrious and frugal. He sold the Holbrook dairy realizing $1,400 cash. After consultation with the defendant, he, together with his partner Zumwalt, purchased the Palatine Hill dairy stock and fixtures for $5,000, paying the $1,400 cash, and with Zumwalt gave a mortgage to Tapfer for $1,953.05, and assumed a small note. Mr. and Mrs. Schneider purchased Zumwalt's interest in May, 1916. Mrs. Schneider abandoned plaintiff September 5, 1916. About October 25, 1916, she commenced an unsuccessful suit for a divorce. On October 17, 1916, Tapfer foreclosed the mortgage for $1,953.05 and brought action on the note against plaintiff for a balance of $646 and ousted the plaintiff from the premises.

In regard to the relations existing between the plaintiff and his wife before and at the time of the separation, and as to the conduct of the defendant, part of the testimony was as follows: Theodore Villiger, witness for plaintiff, testified in substance that he had run the Palatine Hill dairy and sold the same to plaintiff and his partner Zumwalt for $5,000. That at one time defendant said plaintiff Schneider was a fool and a greenhorn, and that kind of stuff, and was no business man; that he could see that defendant did not like plaintiff. Mrs. Lillian Reiser, witness for plaintiff, testified to the effect that she and her husband went to work at the Palatine Hill dairy August 25, 1916; that they lived in the house with plaintiff and his wife who lived as happily as any married people

could; that she was loving to him, kissing him, spoke well of him, and never complained; that Mr. Tapfer, the defendant, was there at the home of plaintiff on September 4, 1916, the day before his wife left to go home; that Mrs. Schneider expected to visit her parents and had made arrangements to leave the little girl with the witness; that Mr. Tapfer told his daughter she had better bring both children with her; that Mrs. Schneider said she would be back in a week or ten days; that she never came back; that plaintiff sent the witness to the father's home in Washington to try to beg her to come back, "and that evening I tried to beg her to come back home, and she consented that I could take the little girl, and the next morning she backed out and said I could not take her." She was then living in her father's house; that the witness told Mr. Tapfer she tried to coax her to come back, and let them take care of their children as a father and mother ought to do, and that he did not say anything one way or the other; that on the fourth day of September, when Mr. Tapfer came to plaintiff's home, he was there during dinnertime and that Mrs. Schneider was sick and her father "asked her how she was getting along, and she said she wasn't any better. He asked her if she had finished paying the doctor's bill. She had went and had an abortion performed, and she said 'No,' and he laid down a twenty-dollar gold piece on the kitchen table for her to go and finish paying the doctor bill." That the next morning after Mrs. Schneider left home, Mr. Tapfer called the witness over the telephone twice and asked her if Mary had started, she was supposed to meet her father and go home with him; that he was impatient to know whether or not Mary was coming.

In answer to the question, "What did you tell him on the second call?

"A. I told him she said—he said for her to come up to your office, Von Hoomissen's office, and I told him that was where she was going.

"Q. How did you know she was coming up to my office?

"A. That is what she told me to tell him if she missed him. She would meet her father at your office."

She left that morning with the two children.

Emil Reiser, husband of the former witness, testified that plaintiff and his wife got along well together; that they were very loving and affectionate.

Anne O'Keefe, witness for plaintiff, testified to the purport that she lived on Palatine Hill about a quarter of a mile from plaintiff and his family, and that she and the Schneiders frequently visited; that as far as she could see Schneider and his wife got along as nice as any married couple, they were jolly, friendly and affectionate, they always had lots of fun together in the evening. This witness stated that she had a talk with Mrs. Schneider when she was very sick; and that she said "that she had had an abortion performed; that he [Schneider] did not want me to have it done." I said, "I would never tell anybody about that," and she said, "I never told anybody but papa and you, Mrs. O'Keefe."

Plaintiff, Jacob Schneider testified in his own behalf in substance that he and Mary Tapfer, the daughter of the defendant, were married August 1, 1912; that before they were married he worked for the defendant on the Palatine Hill dairy and afterwards near Vancouver, commencing 1911; that he quit work about the last part of July, 1912, went back to the old place on

Palatine Hill and worked for a Mr. Naegly for about
two weeks; that Mary wrote to him that her father
wanted him to quit and give her up; that they were
married without the knowledge of her parents, and
they went to Denver, Colorado, where they remained
about five months, and then they went to a place near
Seattle where they worked about three months, on a
farm. That about the 12th of August, 1916, Mrs.
Schneider told him as follows:

"She said she told her papa about it, that she was
in the family way, and he told her to go to the doctor
to have an operation performed. I told her on the
phone I would not do such a thing. That as long as
God give me two children he could give us another one
and I was willing to raise the child."

That after his wife left him September 5th, he went
to see her three times. The first time about the middle
of September. About that time Mr. Von Hoomissen
told him, "Well, Jake, your wife was here and she told
me she won't go back to you." I said, "What is
wrong?" And he said, "She said she don't want any
more children." That about ten or twelve days after
his wife left him, after writing two letters, he went to
Mr. Tapfer's and asked to see Mary, and asked where
she was; that her father told him she was in the City
of Portland; that his wife afterwards told him she
was cooking for a straw-baling crew about a mile and
a half from her father's place; that when he worked
for the defendant "he was cross and rough against
me"; that defendant called him an "ignorant fool"
and "crazy," he even called me "a s——of-a-b——";
that when the children cried defendant said they
"were just like the old man"; that his wife told him
that her father told her a few times that "as long as
she lives with me she wouldn't get nothing. She

wouldn't get nothing from him." That he had only seen his wife to speak to her in the lawyer's office once since she left him; that he begged her to come back and that he begged her father to give her back; that there was no dispute or trouble when his wife left him. The plaintiff further testified that the defendant told him to his face that he was a fool; that he was a green, ignorant foreigner; "that I was no man for Mary." Mrs. Mary Schneider, as a witness for the defendant, in answer to the question, "Why did you leave him [plaintiff] the last time?"

"A. Because he had gotten me into the family way, and I had an abortion performed, and he had called me a murderess and treated me without any consideration whatever, and he demanded me to work just as hard after that operation as when I was in perfect health, and I was so worn down and run down and sick that I couldn't stand it to live with him any longer, and that was the reason I left. I thought if I stayed with him any longer my years were numbered."

There was direct evidence tending to show that the defendant stated to plaintiff that he was a fool and an ignorant foreigner; "that he was no man for Mary"; and that the defendant was instrumental in influencing Mary Schneider to leave plaintiff's home when he told her on September 4, 1916, the day before she left that "you better come out with me and take the children along"; that the defendant had furnished his daughter with money when the husband had refused to supply her with funds for the purpose desired, and the further fact that he inquired of Mary whether she had finished paying the doctor and let her have $20 for that purpose; that before Mary left, defendant had a conversation with her in the German language which the witness Mrs. Reiser, who was present, could not under-

stand, and that when Mrs. Reiser at plaintiff's request
went to defendant's home after the separation to in-
duce the wife to return to her husband's house, and
she consented to let Mrs. Reiser take the little girl
with her upon her return, that when Mrs. Reiser was
talking to the defendant and Mrs. Schneider both in
regard to the matter, the defendant said nothing and
did not attempt to induce the wife to return to her
home; that on the following morning the wife changed
her mind and refused to let the child return with Mrs.
Reiser, and further that when plaintiff visited the de-
fendant's home to beg his wife to return the defend-
ant told plaintiff his wife was in Portland, when she
was only a short distance away cooking for straw-
balers; that the wife left her husband on September 5,
1916, and never returned; that when she left she went
direct to the office of an attorney who had done her
father's business for about two years before that time,
and consulted him in regard to obtaining a divorce;
that defendant telephoned to Mrs. Reiser about meet-
ing his daughter at the law office.

From the statement of defendant to the wife at the
time of the money transaction on September 4, 1916,
and the other circumstances in evidence, the jury
might fairly believe that the defendant knew about the
criminal operation and that defendant aided and en-
couraged Mrs. Schneider in having the same per-
formed against the will of her husband; that defend-
ant maliciously influenced his daughter to leave her
husband and remain away from her home; that when
she left it was understood between her and her father
that she was not going to her father's home for a visit
only, but to remain.

92 Or.—86

It is the claim of defendant's counsel that the witness Lillian Reiser "squarely perjured herself in relation to this transaction, and having heard of the passing of the $20 declared she saw it given." This is certainly a very material incident as testified to by Mrs. Reiser, but the truth or falsity of her statement is a question solely for the jury to determine. It is contended on behalf of defendant that the testimony in regard to the defendant letting Mrs. Schneider have money for a certain purpose had no relation to the condition of the mind of the wife, and was incompetent, but the jury evidently came to a different conclusion in regard to the matter. This was the situation: Mrs. Schneider had solicited the consent of her husband to have the operation performed and funds to pay for the same, and had been refused. She then states that she went to her father and told him her trouble and received his approval and the money to pay the expense. Could the jury not believe from this that it would tend to lower the plaintiff in the estimation of his wife in failing to do for her what her father was willing to do? In her mind this was an important matter and according to her version as a witness related to the cause of her leaving the plaintiff.

Malice need not consist of open and affirmative declarations, but may be indicated by conduct and acts and in determining whether the defendant acted maliciously it is necessary to consider the circumstances, situation and relationship existing between the parties: *Leavell* v. *Leavell,* 122 Mo. App. 654 (99 S. W. 460). Some of the evidence is circumstantial and a large part of the testimony is contradicted by defendant. Nevertheless, it cannot by any process of reasoning be said that there was no competent evidence

to support the verdict. In considering the testimony in this case, we should not lose sight of the fact that according to the result of the divorce proceeding the plaintiff Jacob Schneider was not at fault. From that result it does not appear that there was any necessity for the defendant Tapfer to interfere and care for his daughter. The weight of the evidence and the credibility of the witnesses are solely for the consideration of the jury. There were no exceptions saved to the charge of the court to the jury. Much of the testimony was detailed by the witnesses without objection, both sides giving their version of all the main facts and circumstances of the case. In *Price* v. *Price,* 91 Iowa, 693 (60 N. W. 202, 51 Am. St. Rep. 360, 29 L. R. A. 150), an action by the wife against the parents of the husband for alienation of the husband's affection, it was held that evidence that the defendants had threatened the husband with disinheritance if he continued to live with plaintiff; that while living happily with plaintiff he received letters from defendants which he refused to show plaintiff and immediately thereafter left, was competent to sustain a verdict for plaintiff. In the present case the threat that plaintiff's wife would receive nothing from defendant as long as she lived with plaintiff is practically identical with that in the Iowa case. The conversation defendant had with his daughter in German just before she left the plaintiff corresponds with the suppressed letter in the case mentioned. It was for the jury to draw their own inference from these facts and circumstances taken in connection with the other testimony in the case.

In passing upon a motion for nonsuit on review, the appellate court will give the plaintiff the benefit of all

the legitimate inferences that may fairly be drawn from the evidence. An assignment of error in denying such motion will be sustained only when there is no legitimate room for a difference of opinion as to the effect of the evidence, and when the court can say that there is no evidence tending to support the verdict in some essential particular; this although the testimony of plaintiff is contradicted by that of the defendant: Article VII, Section 3, Constitution of Oregon; *Crowder* v. *Yovovich,* 84 Or. 41 (164 Pac. 576); *Sink* v. *Allen,* 79 Or. 78 (154 Pac. 415); *Johnson* v. *Portland Ry., L. & P. Co.,* 79 Or. 403 (155 Pac. 375).

The reciprocal obligations of parent and child endure through life, and the duty of discharging these divinely instilled obligations cannot be abrogated by the child's marriage. The parent may in good faith counsel and advise his daughter who has contracted an unhappy marriage, and may care for her in the parental home even against the expressed wish of the unfaithful husband: *Tucker* v. *Tucker,* 74 Miss. 93, 98 (19 South. 955, 32 L. R. A. 623). Hence in an action against the father of plaintiff's wife for the alienation of the latter's affection, it is incumbent upon the plaintiff to show that the defendant was actuated by malice. In such a case the father under the cloak of parental kindness toward his daughter has no license to transcend both divine and human laws and counsel, encourage or aid the wife in the advancement of a petty whim or desire to have a criminal operation performed.

Taking into consideration all of the acts and conduct of the defendant, his demeanor toward plaintiff, his statements to plaintiff, and his action soon after the wife left plaintiff, in harshly foreclosing the mortgage on the dairy property when plaintiff had succeeded in

reducing his indebtedness during the short time that he run the dairy under somewhat adverse circumstances, and attaching plaintiff's property, and ousting the plaintiff from the dairy farm, it was for the jury to say whether the defendant evinced malice toward plaintiff. There was evidence tending to show such malice. A careful reading of all of the testimony, some of which has been referred to, leads us to conclude that there was no error in overruling the motion for a nonsuit.

Another assignment of error is directed to a conversation between plaintiff and Mary Tapfer immediately prior to their marriage, in which she told the plaintiff that her father and mother "wanted her to quit altogether." It was plaintiff's contention that because of the runaway marriage and other circumstances pertaining to their union, defendant cherished a feeling of hostility toward him. This conversation threw a mere sidelight on the conditions existing at the time of the marriage. The defendant went into the same subject in his testimony. This testimony was of the same nature as that heretofore discussed. There was no reversible error in admitting the same.

The cause was fairly submitted to the jury. The judgment of the lower court should be affirmed.