Argued at Pendleton October 25, 1920, reversed and remanded January 4, 1921.

## PUGSLEY *v.* SMYTH.

(194 Pac. 686.)

**Husband and Wife—Elements Constituting Alienation of Affections Stated.**

1. The action for alienation of affections is based on loss of consortium, and loss of service or pecuniary loss is not a necessary element.

**Husband and Wife—Defendant must have been Intentional and Controlling Cause of Alienation.**

2. Defendant's conduct must have been the intentional cause and the controlling cause of the alienation of affections, although there may have been other contributing causes.

**Husband and Wife—Cause of Action for Alienation not Dependent on Showing Adultery.**

3. Physical separation of the spouses is not essential, and it is not necessary that plaintiff prove debauchment, though generally, in the absence of adultery, defendant is not liable unless acting maliciously.

---

1. On actual separation or abandonment as prerequisite to action for alienation of affections, see note in Ann. Cas. 1918A, 647.

**Husband and Wife—In Action for Alienation Natural Expressions
of Wife Showing State of Mind are Admissible, Though Involv-
ing Acts and Words of Defendant.**

4. The declarations of the deserting wife, though made in the
absence of defendant, are available to prove the state of the wife's
affections, her motive, and the effect produced upon her by defend-
ant's conduct, notwithstanding such declarations involve statements
of acts done or words spoken by the defendant, but such declara-
tions must not be mere narratives but natural expressions of the
emotions showing her state of mind.

**Husband and Wife—Wife's Admission to Husband of Past Adultery
not Admissible in Alienation Suit.**

5. In an action for alienation of wife's affections, the husband's
testimony of her admission of past misconduct and adultery with
defendant was inadmissible; the utterance not being a part of the
act, nor made at or approximately before the alienation, so that it
was a mere narrative of past events.

**Witnesses — Wife's Admission of Adultery Made to Husband is
Privileged.**

6. In an action for alienating affections of plaintiff's wife, her
communications to plaintiff admitting adultery with defendant were
shielded by Section 733, subdivision 1, Or. L., relating to privileged
communications between spouses.

**Appeal and Error—No Presumption That Wife Consented to Revela-
tion of Her Privileged Communications.**

7. The ruling of the court in an alienation of affections suit in
admitting privileged communications of plaintiff's wife cannot be
supported on the theory that, there being no affirmative statement
in the record showing that she objected to the revelation of her
communications, it must be presumed that she consented, where all
that was done or said at the trial appears in the record and no
such consent appears therein.

**Husband and Wife—Statement by Wife That Defendant Loved and
Intended to Marry Her Admissible in Husband's Alienation
Action.**

8. In an alienation action, plaintiff's testimony that his wife
said defendant had promised to provide her anything she wanted
that money would buy, that he was going away to school, that she
was going there, etc., was inadmissible as a narrative of fact,
while another witness' testimony that plaintiff's wife said she was

---

5. On competency of one spouse to testify as to misconduct of
other in action for alienation of affections, see note in 39 L. R. A.
(N. S.) 317.

6. The question as to whether conversation between husband and
wife tending to show affection or the contrary are privileged is
discussed in a note in 2 L. R. A. (N. S.) 708.

8. On admissibility of statements or declarations of plaintiff's
spouse concerning acts or conduct of defendant in action for aliena-
tion of affections, see note in 4 A. L. R. 497.

in love with defendant, who did not care for his own wife and intended to marry her, etc., was admissible as a natural expression of wife's emotion.

**Trial—Requested Instructions to be Tested by Words Used, not by Words Meant to be Used.**

9. In action for alienation of affections, requested instruction that "evidence of statements of wife of the injured spouse were received in this case and admitted in evidence for the purpose only of showing the feelings of the injured spouse," and not to establish the facts stated, *held* properly refused, declarations of the wife being inadmissible to prove the husband's feelings, although it may be assumed it was intended by the framer of the instruction to so word it as to advise the jury that the wife's declarations could only be considered as evidence of her feelings; yet the instruction must be tested by the words found in it.

**Husband and Wife—Cautionary Instructions as to Wife's Declarations Desirable.**

10. In an alienation of affections suit, since evidence of the alienating spouse's declarations is receivable only for a limited purpose, and cannot be considered as evidence that defendant really did the acts or uttered the words attributed to him by such declarations, the court should advise the jury of the limited purpose for which such declarations may be considered; for, in the absence of a cautionary instruction, jurors will naturally assume that such declarations may be treated as evidence that defendant actually did or said what the alienated spouse said he did or said.

**Trial—Refusal of Instructions Covered by Others not Error.**

11. It is not reversible error to refuse requested instructions which are accurate and concise statements of the law applicable, where such matters are substantially covered by other instructions.

**Witnesses — Statute Held to Privilege All Communications, not Merely Confidential Ones—"Any Communications."**

12. In Section 733, subdivision 1, Or. L., and Section 734, the words "any communications" do not mean "confidential communications," but that all communications between husband and wife are privileged unless express or implied consent to publication is given, or unless the privilege is lost by being brought within one of the specified Code exceptions, and such statutes apply to suits for alienation of affections.

From Harney: Dalton Biggs, Judge.

In Banc.

Clifford D. Pugsley sued Fred W. Smyth for damages for alienating his wife's affections. A trial

resulted in a verdict and judgment for Pugsley. Smyth appealed.

One assignment of error is based upon the refusal of the trial court to direct a verdict for the defendant, and for that reason an extended statement of the evidence given at the trial becomes necessary.

The plaintiff and his wife were married in about the year 1909. There were two children; a daughter aged 10 years and a son aged 7 years.

The defendant and his "people" live at Diamond, in Harney County. During most of the period of the plaintiff's married life he has been employed by "the Smyth people," and according to the testimony of the plaintiff, he was so employed "off and on for, I think, about nine years." Both the plaintiff and his wife lived at "the Smyth place" when he was "employed by them." The plaintiff says that he and his wife lived happily together until the summer of 1919. Pugsley stated that "starting in the summer of 1919" he observed that his wife and the defendant "were going about a great deal together," and "were about together a great deal by themselves." Pugsley cites one time when at a dance Smyth "danced every other dance with her." In this connection it is appropriate to call attention to the testimony of Mrs. Bradburn, a sister of the plaintiff, who resides at Diamond and during portions of 1919 was employed "at the Smyth ranch." Mrs. Bradburn testified that—

In May "we was camped down below" the Smyth house "and my little nephew Norris came down to the camp and told me that his mother said he could stay a couple of hours to play with the children, the girls. I was on my way up to the ranch to send a letter. * * I went on in the front room [of the Smyth house]; supposed Nora [Mrs. Pugsley] was around. I played

a record on the graphophone; stayed there a little while, thinking she would come in. Pretty soon Fred [Smyth] came down the stairs. I asked him where Nora was. He said he didn't know, and I played another record and Nora hollered down to me from upstairs and told me to come on up, and she said, 'Why, I didn't know who that was playing'; and I went on up.''

The plaintiff says that he did not become aware of any relationship between his wife and Smyth until the 13th or 14th of July, 1919, when he found in her pocket a note which Smyth had written to her. The plaintiff ''left that night,'' but he afterwards returned and ''tried to talk her into the notion of leaving the Smyths entirely and going away, * * and she finally consented to go. We was going up to Pendleton and work through harvest.'' The plaintiff and his wife then ''came up to Burns,'' where they stopped ''a couple of days'' at the Levens Hotel. They did not go on to Pendleton, however, for the reason that Mrs. Pugsley refused to ''go on any farther.'' In the language of the plaintiff: .

''She told me that she couldn't go away and leave him; she thought more of him than she did of me and I might as well just go on. * * She told me all of her plans. * * She explained to me how that she was going to get Fred. They was going away to live very happily. I asked her, I says, 'How are you going to pull anything like that with Lenora [Fred's wife]?' and she said Fred would have that fixed up. * * She told me that—to go ahead and get my divorce; * * that she didn't care anything for me any more.''

The plaintiff also testified that his wife told him ''that her relation with Fred Smyth had been improper,'' and that ''the relations between her and Mr. Smyth were adulterous.'' It is clear from the transcript that the statement ascribed to Mrs. Pugsley to the effect that the relations with Smyth ''had been im-

proper" was made by her, if at all, in July, while they were stopping in the Levens Hotel at Burns; but it is not entirely clear whether the other statement about their relations having been adulterous was made at this time in July or a month later when he returned to Burns from Prairie City in response to a telephonic request from his wife, although it is probably a fair inference to say that this statement was also made in July rather than in August.

The plaintiff then left Burns and "went on to Prairie City," and his wife "went back to Diamond." At the suggestion of Mrs. Pugsley the plaintiff took the son with him. After the plaintiff had been in Prairie City about a month his wife "phoned there and wanted me to fetch the boy back." The plaintiff thereupon went to Burns and met his wife there. Mrs. Pugsley was stopping in the Levens Hotel, and she and the plaintiff stayed together in the hotel overnight. While in her room at the hotel the plaintiff looked in her suitcase and found a photograph of Smyth and a note written by Smyth to Mrs. Pugsley as follows:

"Hello, there: Say I was coming up anyway. Yes; I'll sure be there. It might be kind of late for I have to kill a beef first see but I'll sure come to-night.
                                    "Good-by."

Notwithstanding the disclosures made by his wife and the finding of the note and photograph, the plaintiff claims that he did "everything I could to get her to come back and live with me." As a result of this meeting at Burns the plaintiff and his wife "went back out to Diamond"; and he says that:

"He kept trying to get her in the notion of going away and getting out of the country, you see, and forgetting all about this thing. * * I kept coaxing her to go. Finally she said she would go away and see how we could get along."

After they had been in Diamond about a week, the husband and wife started for Idaho. They went to Crane by automobile and there stayed together overnight, and on the following day they boarded a train. They had proceeded on their way as far as Ontario and there they discussed their troubles with a lawyer, who advised them to forget the past and resume living together. They then "got a room" in a hotel. Pugsley states:

"When we got up in the room she just came right out and said that she wouldn't go any further with me; she was done; she couldn't forget this bird and she was going back with him."

The next day Mrs. Pugsley returned to the vicinity of Diamond, and shortly afterwards her husband also returned to the neighborhood of Diamond and there found employment "at the Diamond ranch." After going to this ranch the plaintiff made a trip "to Diamond," and as he was "coming back" he saw his wife and Smyth "in the lane together." At some time, not disclosed by the record, Pugsley left the Diamond ranch and went to Winnemucca, and subsequently he left Winnemucca and again went to Burns, arriving there about November 20, 1919. In the meantime his wife had gone to Burns. Upon reaching Burns on about November 20th, Pugsley found his wife sick, the children not feeling good, and they were "about broke." Pugsley supplied his wife and children with money until February 1, 1920, and then, to use his language, "she came out where I was working out to the island," and he also says that she lived with him at the island "right up till lately." The plaintiff declares that after his wife came to him at the island he "talked it over, but she says she don't like me like she used to or like she ought to."

The plaintiff and his wife were living together in Burns at the time of the trial, which occurred in April, 1920, and although the plaintiff stated that on account of the children he was anxious to effect a complete reconciliation, nevertheless, her feelings toward him were not as they were before 1919, and his feeling towards her "is not as good as it was a long time ago, hardly as good."

On redirect examination the plaintiff was asked: "Since you discovered her relationship with Mr. Smyth, has she at various times asked you to leave and go away by yourself?" And he answered thus: "Yes, sir." The next question and answer were as follows:

"Q. What would she say about Fred Smyth providing her with a home or with money or automobiles or things of that kind? A. Well, she said he promised to provide her with anything that she wanted, as far as money would buy. I believe she said one time he was going back down to Corvallis to go to school and she was going to go down there, and I don't know whether she would keep house for him or not, but he was going to buy him a new roadster and she would have all the use of that she wanted and they was going to be very happy."

Charles Fraser, whose wife is a sister of Mrs. Pugsley, testified that "during the first days of August [1919] some time" Mrs. Pugsley, who had been staying at his house "a couple or three days," asked him if he "cared if she had a caller one evening," and that on that evening Smyth called upon her. Lucille Fraser, the daughter of Charles Fraser, told about carrying notes from Mrs. Pugsley to Smyth and from Smyth to Mrs. Pugsley during the time in August when Mrs. Pugsley was staying at the Fraser home in Diamond.

Mrs. Bradburn, a portion of whose testimony has already been recounted, also testified that she recalled the time when the plaintiff and his wife left the Smyth place on account of the letter discovered by him; that she remembered that several days after leaving the Smyth place Mrs. Pugsley returned and was "a frequent visitor there at the Smyth ranch"; that one evening Mrs. Pugsley "came over to the ranch" and the witness saw Mrs. Pugsley in company with Smyth go by the witness' camp "towards the barn," and at the end of twenty or thirty minutes "they came back to the house." Mrs. Bradburn also testified that—

After Mrs. Pugsley "came back" she "told me that Fred was in love with her; didn't care for his wife any more; intended to marry her. They intended to get married as soon as he could get rid of Lenore, that is, as soon as—if she and my brother had decided to separate because they couldn't get along, and she didn't care for him any more, she loved Fred."

Mrs. Bradburn also testified that she talked with Mrs. Pugsley and Smyth, when all three were together, about their conduct and that she told Smyth that Mrs. Pugsley "would turn against him," and that thereupon Mrs. Pugsley exclaimed, "Fred, don't believe it. I will never turn against you"; and that she (the witness) "charged them with improper relations at that time" and "they didn't deny it."

The printed abstract specified fifteen assignments of error, but in his printed brief the defendant discusses only nine of them. Four of the assignments arose out of objections to testimony; three are based upon the refusal of the court to give instructions requested by the defendant; one is predicated upon the giving of an instruction over the objection of defendant; and the last grows out of the refusal of the court

to direct a verdict for the defendant. The first three assignments of error relate to testimony given by the plaintiff, and the fourth involves an answer of Mrs. Bradburn.

Assignment of error (1) arises out of the following question asked the plaintiff and answer given by him:

"Now at that time [meaning the time in July when the plaintiff and his wife were in the Levens Hotel at Burns] did she [Mrs. Pugsley] tell you that her relation with Fred Smyth had been improper? A. Yes, sir."

Assignment of error (2) relates to testimony given by the plaintiff after having been recalled as a witness in his own behalf. His attorney submitted the following question: "Mr. Pugsley, I believe I asked you this afternoon about a statement you made to your wife in the City of Burns at the time she left you. I did not ask you this question, I think: Did she tell you at that time that her relations and the relations between her and Mr. Smyth were adulterous?" The witness answered, "Yes, sir."

Assignment of error (3) is based upon the ruling which permitted the plaintiff to testify that his wife told him that Smyth—

"Promised to provide her with anything that she wanted, as far as money would buy. I believe she said one time that he was going back down to Corvallis to go to school and she was going to go down there, and I don't know whether she would keep house for him or not, but he was going to buy him a new roadster and she would have all the use of that she wanted and they was going to be very happy."

Assignment of error (4) questions the competency of the testimony given by Mrs. Bradburn when she stated that—

Mrs. Pugsley "told me that Fred was in love with her; didn't care for his wife any more; intended to

marry her. They intended to get married as soon as he could get rid of Lenore, that is, as soon as— if she and my brother had decided to separate because they couldn't get along, and she didn't care for him any more, she loved Fred."

Assignments which for convenience are here numbered respectively (5), (6), and (7), are predicated upon the refusal of the court to give the following three several requested instructions:

"Evidence of statements of the wife of the injured spouse were received in this case and admitted in evidence for the purpose only of showing the feelings of the injured spouse, and not for the purpose of establishing the facts therein stated.

"That there is no ground for an action of this character where a spouse voluntarily gives his or her affections to another; the latter doing nothing wrongful to win such affections.

"To support an action for alienating a wife's affections, it must be established that the defendant is the enticer. Mere proof of abandonment and that the wife maintains improper relations with the defendant is not sufficient to bring in a verdict for damages."

Another assignment, which we shall designate as (8), involves the following instruction given to the jury:

"It is not necessary, however, that the actions of the defendant shall be the sole and only cause of the alienation of the wife's affections. If it is a substantial and moving cause, without which the affections would not have been alienated, then the defendant is responsible in damages for his conduct in that matter." REVERSED AND REMANDED.

For appellant there was a brief over the names of *Mr. J. W. McCulloch, Messrs. Biggs & Biggs* and *Mr. F. E. Swope,* with an oral argument by *Mr. McCulloch.*

For respondent there was a brief with oral arguments by *Mr. P. J. Gallagher* and *Mr. W. H. Brooke.*

HARRIS, J.—1–3. Each spouse is entitled to the conjugal society, affections, and assistance of the other. A third person who intentionally alienates or entices one spouse from the other is generally liable to the latter. Loss of service is not the basis of the right of action, for pecuniary loss is not a necessary element; but the right to recover is based upon loss of consortium. However, loss of consortium does not alone create a right of action; nor is a right of action brought into existence by the added fact that a spouse has voluntarily transferred his or her affections to a third person, the latter doing nothing wrongful to win them. Stated broadly, the rule is that the third person's conduct must have been the intentional cause of the loss suffered by the injured spouse. The conduct of the third person need not be the sole cause, but it is sufficient if the third person's conduct was the controlling cause which produced the estrangement, although there may have been other contributing causes. It is not necessary for the husband to prove the debauchment of his wife, nor is it essential that there shall be a physical separation of the spouses. If, however, the element of seduction or adultery is not present, the general rule is that a third person is not liable for alienation of affections unless he acted maliciously or from improper motives implying malice in law.

In order to ascertain whether a right is assertable and enforceable by the husband, and whether a corresponding liability has been incurred by the defendant, there must be an examination of the conduct of Mrs. Pugsley and the relations between her and her hus-

band, and also an examination of the conduct of the defendant and his relations with Mrs. Pugsley, so that it can be finally determined whether there is a causal connection between the conduct of Smyth and the mental state and conduct of Mrs. Pugsley, and then, if there is, whether the conduct of the one is the controlling cause and that of the other is the effect.

Not much difficulty is likely to be encountered when the inquiry relates directly to acts done or words uttered by the defendant. Ordinarily an investigation will be free from controversy, both as to the governing rule and also as to the application of the rule, where the inquiry relates directly to acts done by the alienated spouse, or even when the inquiry is broadened and includes the declarations of the deserting spouse directly asserting the existence or loss of affection; but dispute usually begins the moment any attempt is made to inquire about declarations made by the deserting spouse, out of the presence of the defendant, concerning acts done or words spoken by the defendant; and it is apropos to add that this resultant contention arises not so much from differences of opinion about the governing rule of law as from the difficulty experienced in applying the rule, for frequently, as is well illustrated by the reported precedents, different minds will not always agree that a given declaration is within or without an agreed rule. In other words, even in those jurisdictions where declarations of the deserting spouse about the acts and utterances of the defendant may in certain circumstances, even though made in the absence of the defendant, be competent, there will be rcom for debate concerning the applicability of the rule.

A feeling or emotion, such as joy, fear, hatred, affection, is only a mental element—a frame of mind.

It is not a substantive thing like a stick or a stone.
Its size cannot, like a box, be measured by a yard-
stick.   Its quantity cannot, like cereals, be measured by
a bushel.   Its presence, however, may be known and
its degree evidenced, not only by gestures, facial ex-
pressions, and general physical conduct, but also by
spoken words.   Wordless conduct may be indicative
of a condition of mind, and so, too, verbal utterances,
even though not employed assertively, may indirectly
indicate a condition of mind.   The doctrine which
sanctions the admission of verbal utterances consti-
tutes an exception to the hearsay rule rather than a
violation of it.   The exception arises out of the ulti-
mate fact, which is disclosed in the final analysis, that
the utterance is in truth a natural and spontaneous
verbal manifestation of an emotion, just as a facial
expression or a gesture is the wordless manifestation
of an emotion; and it matters not whether we call the
vocal utterance a verbal act or a part of the *res gestae*
or original evidence, for it is within the knowledge of
all persons that a vocal utterance may be indicative
of the feeling that inspired it just as a suddenly
flushed cheek may be indicative of shame or surprise,
or just as shattered nerves or trembling hands or a
whitened face may be the natural and uncontrollable
manifestations of fear: *State* v. *Farnum*, 82 Or. 211,
249 (161 Pac. 417, Ann. Cas. 1918A, 318).   When,
therefore, the state of a person's mind is the subject
of inquiry, it is ofttimes competent to consider verbal
utterances made by that person: 3 Wigmore on Evi-
dence, §§ 1715 and 1730.

4. In cases brought to recover damages for the
alienation of the affections of the spouse, the state of
the affections of the deserting wife, the effect pro-
duced upon her mind by the conduct of the defendant,

and her motive or motives become material; and pursuant to the doctrine which permits a verbal utterance to be considered, like wordless conduct, as indirect evidence of the emotion which inspired it, the general rule is that declarations of the deserting wife, though made in the absence of the defendant, are available as evidence in behalf of the injured husband to prove the state of the affections of the alienated wife, her motive, and the effect produced upon her mind by the conduct of the defendant, notwithstanding such declarations involve statements of acts done or words spoken by the defendant. This is the general rule established by the authority of judicial precedents. There are a comparatively few jurisdictions in which the rule is rejected. There are some reported decisions which, when read superficially, might be thought to be repudiations of the rule; and yet, in most instances when the reasoning of those decisions is closely examined, it will appear that the rule itself is recognized and approved, but its applicability to the facts denied. At any rate, in most jurisdictions the rule is as already stated, and it has become *stare decisis* in this state: *Saxton* v. *Barber,* 71 Or. 230, 239 (139 Pac. 334); *Schneider* v. *Tapfer,* 92 Or. 520, 526 (180 Pac. 107); *Cripe* v. *Cripe,* 170 Cal. 91 (148 Pac. 520); *Hardwick* v. *Hardwick,* 130 Iowa, 230 (106 N. W. 639); *Hillers* v. *Taylor,* 116 Md. 165 (81 Atl. 286); *Moir* v. *Moir,* 181 Iowa, 1005 (165 N. W. 221); *Melcher* v. *Melcher,* 102 Neb. 790 (169 N. W. 720, 4 A. L. R. 492); *Nevins* v. *Nevins,* 68 Kan. 410 (75 Pac. 492); *Rudd* v. *Rounds,* 64 Vt. 432 (25 Atl. 438); *Williams* v. *Williams,* 20 Colo. 51 (37 Pac. 614); *Gilbreath* v. *Gilbreath,* 42 Colo. 5 (94 Pac. 23); *Warren* v. *Graham,* 174 Iowa, 162 (156 N. W. 323); *Rose* v. *Mitchell,* 21 R. I. 270 (43 Atl. 67); *Jones* v.

*Jones,* 96 Wash. 172 (164 Pac. 757) ; *Edgell* v. *Francis,*
66 Mich. 303 (33 N. W. 501) ; *McGowan* v. *Armour,*
160 C. C. A. 576 (248 Fed. 676) ; *Hanor* v. *Housel,*
128 App. Div. 801 (113 N. Y. Supp. 163) ; 13 R. C. L.
1478 ; 3 Elliott on Evidence, § 1648.

There are, of course, limitations and restrictions
upon the rule. The reason of the rule naturally sug-
gests the limitations upon the rule. If the utterance
is nothing but a recital or narrative of what has been
done or said, and is not the spontaneous and natural
manifestation of the then existing emotion which in-
spired and produced it, then it does not come within
the reason of the rule and is not admissible. It may
be that in a given conversation between the husband
and his deserting wife she may make many declara-
tions; and while some of these declarations may be
natural expressions of emotions, yet the others may
be pure narratives of acts done and words spoken,
and hence not admissible.

Unless the verbal utterance of the deserting spouse
can be said to have been a vocal manifestation of the
then existing state of her mind, it is pure hearsay if
it involves a statement of a declaration made by the
defendant, and on that account is not admissible. It
is not enough to say that a declaration made by the
wife concerning acts or utterances by the defendant
are accompanied by other declarations which reflect
her then existing emotions, but the kind of declara-
tions now under discussion must themselves come
within the reason of the rule which makes them com-
petent. It may be that a given declaration is mean-
ingless and without significance unless viewed in the
light of an accompanying declaration, or it may be
that the latter is without significance unless con-
sidered in connection with the former. Each case is

dependent largely upon its own circumstances, and, as has been frequently remarked, it is sometimes difficult to determine whether a given declaration is included or excluded by the rule: *Westlake* v. *Westlake,* 34 Ohio St. 621 (32 Am. Rep. 397); *Cochran* v. *Cochran,* 196 N Y. 86 (89 N. E. 470, 17 Ann. Cas. 782, 24 L. R. A. (N. S.) 160); *Preston* v. *Bowers,* 13 Ohio St. 1 (82 Am. Dec. 430); *Scott* v. *O'Brien,* 129 Ky. 1 (110 S. W. 262, 130 Am. St. Rep. 419, 16 L. R. A. (N. S.) 742); *Brison* v. *McKellop,* 41 Okl. 374 (138 Pac. 154); 1 Ency. of Ev. 759.

5. If an act of the deserting spouse is the subject of inquiry, a declaration explaining and characterizing that act becomes admissible on the theory that the utterance is a part of the act; as, for example, when the deserting wife or husband takes her or his final departure, declarations made at the time may become competent: *Schneider* v. *Tapfer,* 92 Or. 520, 529 (180 Pac. 107).

Admissible declarations are usually further limited to those which have been made at or approximately before the alienation (*Schneider* v. *Tapfer,* 92 Or. 520, 526 [180 Pac. 107]); and yet, since "the mischief is a continuing one, going on from day to day, and becoming worse with the delay," the inquiry may properly cover the whole period of alienation (*Edgell* v. *Francis,* 66 Mich. 303 [33 N. W. 501]).

6. The testimony embraced in assignments of error (1) and (2) are incompetent for two reasons. Each of the two declarations was a segregated recital of a previously consummated act or acts, a past event, and they are not, in the circumstances disclosed by the record, such vocal manifestations of the mental state as are admissible. Moreover, whether the words "any communication" in section 733, subdivision (1),

Or. L., are construed to mean "all" communications or only "confidential" communications, nevertheless, in either event, both declarations were manifestly privileged communications, and as such were completely shielded by the statute: *Harper* v. *Harper*, 252 Fed. 39 (164 C. C. A. 151); *Sanborn* v. *Gale*, 162 Mass. 412 (38 N. E. 710, 26 L. R. A. 864); *Kohlhoss* v. *Mobley*, 102 Md. 199 (62 Atl. 236, 5 Ann. Cas. 865); *Westlake* v. *Westlake*, 34 Ohio St. 621 (32 Am. Rep. 397); *Millspaugh* v. *Potter*, 62 App. Div. 521 (71 N. Y. Supp. 134); *Hanor* v. *Housel*, 128 App. Div. 801 (113 N. Y. Supp. 163); *Phelps* v. *Bergers*, 92 Neb. 851 (139 N. W. 632); *Sanders* v. *Burnham*, 91 Vt. 481 (100 Atl. 905); 3 Ency. of Ev. 787.

7. The plaintiff argues that there is no affirmative statement in the record showing that Mrs. Pugsley objected to the revelation of her communications, and that, on the authority of *Long* v. *Lander*, 10 Or. 175, it must be presumed that she consented, and that therefore the ruling of the court was free from error. The appeal in *Long* v. *Lander* was presented on an abbreviated bill of exceptions in conformity with the old practice. In the instant case there is before us both a short bill of exceptions and also a record of the entire trial showing "all the evidence" and "all of the proceedings had at the trial": See *Malloy* v. *Marshall-Wells Hardware Co.*, 90 Or. 303 (173 Pac. 267, 175 Pac. 659, 176 Pac. 589). Mrs. Pugsley was not a witness for either party. The defendant declined to offer any evidence, but permitted the cause to be submitted to the jury on the evidence offered in behalf of the plaintiff. Since all that was done or said at the trial appears in the record, and it does not appear that Mrs. Pugsley consented, the presumption invoked by the plaintiff is not available to him for the

reason that it is without a foundation upon which to rest: 10 Ency. of Ev. 200.

8. The testimony in assignment of error (3) does not come within the rule and is not competent.

The testimony of Mrs. Bradburn embraced in assignment of error (4), in our view, is within the rule and is competent.

9, 10. The court properly refused to give the requested instruction found in assignment of error (5). The plaintiff is the "injured spouse," and is referred to as such in the first part of the requested instruction. The declarations of the wife were not admissible to prove the feelings of the husband, and although it may be assumed that the framer of the requested instruction intended so to word it as to advise the jury that the declarations of the wife could only be considered as evidence of her feelings, nevertheless the requested instruction must be tested by the words actually found in it. However, it is appropriate to add that, since evidence of the alienated spouse's declarations is receivable only for a limited purpose and cannot be considered as evidence that the defendant really did the acts or uttered the words attributed to him, the court should advise the jury of the limited purpose for which such evidence may be considered; for, in the absence of a cautionary instruction, jurors will naturally and almost invariably assume that such declarations may be treated as evidence that the defendant actually did or said what the deserting spouse said he did or said: *Schneider* v. *Tapfer*, 92 Or. 520, 529 (180 Pac. 107); *Derham* v. *Derham*, 125 Mich. 109 (83 N. W. 1005); *Hardwick* v. *Hardwick*, 130 Iowa, 230 (106 N. W. 639); *Hillers* v. *Taylor*, 116 Md. 165 (81 Atl. 286); *Moir* v. *Moir*, 181 Iowa, 1005 (165 N. W. 221); *Melcher* v. *Melcher*, 102 Neb. 790 (169 N. W. 720, 4 A. L. R. 492); *Welty*

v. *Sparks,* 179 Iowa, 1390 (162 N. W. 614); *Williams*
v. *Williams,* 20 Colo. 51 (37 Pac. 614).

11. Reversible error did not result from the failure
to give the requested instructions appearing in as-
signments of error (6) and (7), although they are
accurate and concise statements of the law as it is de-
clared in *Saxton* v. *Barber,* 71 Or. 230, 236 (139 Pac.
334), and in *Scott* v. *O'Brien,* 129 Ky. 1, 7 (110 S. W.
260, 130 Am. St. Rep. 419, 16 L. R. A. (N. S.) 742).
See, also, *Keen* v. *Keen,* 49 Or. 362, 366 (90 Pac. 147,
14 Ann. Cas. 45, 10 L. R. A. (N. S.) 504). The advice
contained in these two requests was substantially
given in the charge as delivered to the jury.

The defendant argues that the instruction embraced
in assignment of error (8) is defective because it fails
to state that "the appellant's actions must have been
intentional." The general rule is, as already pointed
out, that the defendant must have intentionally caused
the alienation of the wife's affections: *Saxton* v. *Bar-
ber,* 71 Or. 230, 236 (139 Pac. 334); *Nevins* v. *Nevins,*
68 Kan. 410, 415 (75 Pac. 492); *Keen* v. *Keen,* 49 Or.
362, 366 (90 Pac. 147, 14 Ann. Cas. 45, 10 L. R. A.
(N. S.) 504); *Dodge* v. *Rush,* 28 App. Cas. (D. C.)
149 (8 Ann. Cas. 671). Although the general charge
given by the court was probably sufficient to cure the
alleged defect in the instruction embraced by assign-
ment of error (8), nevertheless, in this connection it
is appropriate to suggest that upon a retrial the ele-
ment of intention can be made clearer to the jury.

It is not necessary to discuss at length the assign-
ment of error which questions the refusal to direct
a verdict for the defendant, for, after excluding the
incompetent declarations of the wife, there yet re-
mains in the record sufficient evidence, if believed by
a jury, to support a verdict.

12. Since there must be a new trial, and in view of the defendant's contention that some of the communications made by Mrs. Pugsley to the plaintiff were privileged communications within the meaning of Section 733, Or. L., it becomes proper to determine the extent of the statute when applied to the marital relation. Section 733, subdivision 1, Or. L., reads as follows:

"A husband shall not be examined for or against his wife without her consent, nor a wife for or against her husband without his consent; nor can either, during the marriage or afterwards, be, without the consent of the other, examined as to any communication made by one to the other during the marriage; but the exception does not apply to a civil action, suit, or proceeding, by one against the other, nor to a criminal action or proceeding for a crime committed by one against the other."

The statute deals, not only with the qualification of one spouse as a witness for or against the other, but also with the privilege with which the law shields communications made by one to the other. The husband was of course a competent witness, and, moreover, the wife becomes a qualified witness when the husband testifies in his own behalf, for by the express terms of Section 734, L. O. L.:

"That is to be deemed a consent to the examination also of a wife, * * within the meaning of subdivision 1 * * of the last section."

However, we are not now interested in the subject of the qualification of one spouse to testify for or against the other; but the present inquiry is directed solely to that portion of the statute which treats of communications made by one spouse to the other.

What does the statute mean? Are the words "any communication" to be given their primary and literal

meaning, so as to embrace every communication, or
are they to be narrowed and limited by an implied
limitation so as to include only confidential communi-
cations? No attempt has thus far been made by this
court to determine the exact limits of the words ''any
communication,'' although there is an intimation in
*State* v. *Luper,* 49 Or. 605, 607 (91 Pac. 444), that the
statute affords material for debate as to whether the
words ''any communication'' mean ''all'' or only
''confidential'' communications. The intention of the
legislature is of course an important element, and,
consequently, courts should and do seek to ascertain
the intention of the lawmakers. Indeed, the influence
of the element of intention is so pronounced that a
doing, though within the letter of the statute, is some-
times construed to be beyond the grasp of the statute,
because not within its spirit; and, on the other hand,
conduct, though not within the strict letter of the stat-
ute, may nevertheless be held to be within the embrace
of the statute because clearly within its spirit. Since
we may with legal propriety, for the purpose of aid-
ing in discovering the intention of the legislature,
inquire about the conditions existing at the time of the
enactment of our statute, we shall direct attention to
the state of the law at the time of the enactment of Sec-
tion 733, Or. L., and then we may with like legal pro-
priety, for the purpose of securing additional assist-
ance in construing the language of our own statute,
prosecute our inquiry still further by looking into the
statutes which have been enacted by most of the states
in the United States.

The common law from an early date privileged com-
munications between husband and wife: 4 Wigmore on
Evidence, § 2333. Notwithstanding its early appear-
ance and recognition, there was even after the lapse of
two centuries some question whether the common law

extended the privilege to communications which in their nature did not seem to be confidential, or whether the privilege was limited to confidential communications; but in 1842, it has been said, it was finally determined in England that the privilege extended to all communications between husband and wife, although on subjects not confidential in their nature: *O'Connor* v. *Majoribanks*, 4 Man. & G. 228; *Dexter* v. *Booth*, 2 Allen (Mass.), 559; *Leppla* v. *Minnesota Tribune Co.*, 35 Minn. 310 (29 N. W. 127); 6 Ency. of Ev. 900. It has also been stated by some American courts, speaking years after the decision in *O'Connor* v. *Majoribanks*, that the common-law courts were not agreed as to the extent of the privilege: *Sexton* v. *Sexton*, 129 Iowa, 487 (105 N. W. 314, 2 L. R. A. (N. S.) 708). Other courts in this country have declared, long after the date of the English decision, that the privilege at common law did not extend to communications which were not in their nature confidential: *People* v. *Mullings*, 83 Cal. 138 (23 Pac. 229, 17 Am. St. Rep. 223). Other precedents illustrate the inability of American judges to agree upon the extent of the common-law rule: *Ex parte Beville*, 58 Fla. 170 (50 South. 685, 19 Ann. Cas. 48, 27 L. R. A. (N. S.) 273). Whether we say that the extent of the common-law rule was settled, so as to include all communications, by the decision rendered in *O'Connor* v. *Majoribanks* in 1842, a time when but few, if any, American states had enacted statutes upon the subject, or whether we say that the rule embraced only confidential communications, or whether we say that the common-law courts never did agree, nevertheless, in either event, the fact that the extent of the rule was a subject for debate and discussion as late as 1842, and even later, as already pointed out, must be treated as one of much importance when taken in connection with the

fact that Section 733, Or. L., was adopted as a part
of our Civil Code in 1862. There is yet another cir-
cumstance which is worth noting. The territorial
Code, which was adopted by the legislative assembly
at the session commencing December 5, 1853, contains
the following provision:

"A husband shall not be examined for or against
his wife, nor a wife for or against her husband; nor
can either, during marriage or afterwards, be, with-
out the consent of the other, examined as to any com-
munication made by one to the other during marriage.
But this exception shall not apply to a civil action or
proceeding by one against the other; nor to a crimi-
nal action or proceeding for a crime committed by one
against the other": Statutes of Oregon 1853, p. 111,
§ 7, subd. 1.

Upon comparing the Code of 1862 with that of 1853,
it will be seen that the clause relating to communica-
tions between husband and wife is exactly the same
in both Codes, except that in the Code of 1853 the
word "the" does not appear before the word "mar-
riage." It will be also observed that, although not
worded alike, the exceptions are the same in both
cases.

Nearly every state in the Union has enacted legis-
lation concerning the competency of one spouse to
testify for or against the other, and so, too, nearly
every state in the Union has adopted a statute con-
cerning the privilege attached to communications
made by one spouse to the other. In most, but not
in all, jurisdictions the same statute covers both the
qualification to testify as a witness and also the privi-
lege accorded to a communication. Except in those
states which have been admitted to the Union within
the last 40 years, most of the legislation was enacted
during the middle third of the 1800's, and a large por-
tion of it was adopted near the end of that period.

Although some of the states have statutes in substance alike, and others have enactments which are alike in both thought and phrasing, still there are to be found among the many statutes material differences, not only in the language employed to define the privilege, but also in the wording used to express the exceptions, when any are specified.

In some of the states, as in New York, North Carolina, Pennsylvania, New Jersey, and Texas, the privilege is expressly limited to "confidential" communications: 5 Birdseye (C. & G.) Consolidated Laws of New York (Penal Law), § 2445; 1 Pell's Revisal of 1908 (N. C.), § 1636; 4 Purdon's Digest (13 ed., Pennsylvania), p. 5163, § 14; 2 Compiled Statutes of New Jersey, p. 2222, § 5; 3 Texas Civil Statutes (1914), Art. 3689.

There are other statutes having legislation substantially like that of New York, although differently phrased, as in New Hampshire, where neither the husband nor the wife shall "be allowed in any case to testify as to any matter which in the opinion of the court would lead to a violation of marital confidence": Public Statutes and Session Laws of New Hampshire in force January 1, 1901, Chap. 224, § 20. In Tennessee it is provided that neither "shall testify as to any matter that occurred between them by virtue or in consequence of the marital relation": Shannon's Code, §§ 5596 and 5597; *McCormick* v. *State,* 135 Tenn. 218 (186 S. W. 95, L. R. A. 1916F, 382). When a statute in terms confines the privilege to confidential communications, there can be no room for debate about the extent of the privilege; and, consequently, precedents dealing with statutes like that of New York can afford but little assistance when construing an enactment like Section 733, Or. L.

In some jurisdictions the limit of the privilege is expressed by the word "private," as in Massachusetts, where "neither husband nor wife shall testify as to private conversations with each other": 2 Revised Laws of Massachusetts (1902), Chap. 175, § 20, subd. 1. In Wisconsin neither spouse shall without the consent of the other "be permitted to disclose any private communication * * when such private communication is privileged. Such private communication shall be privileged in all except the following cases * * ": Wisconsin Statutes (1917), § 4072.

In a few states the single word "communication," unaccompanied by any qualifying word, is employed to designate the extent of the privilege, as in Georgia, where "communications between husband and wife" are "excluded from public policy," and though the husband is a competent witness in a suit for divorce, he "cannot testify to facts derived by reason of marital relations," and the wife, though a competent witness, when the husband is a party, "cannot give evidence as to facts required from marriage relation": 5 Park's Ann. Code of Georgia (1914), § 5785. In Indiana it is declared that neither the husband nor the wife shall be a competent witness "as to communications made to each other": 1 Burns' Ann. Indiana Statutes (Revision of 1914), § 520, subd. 6. When dealing with statutes like that of Georgia, there are strong reasons for saying that the privilege is limited to confidential communications: *Toole* v. *Toole,* 107 Ga. 472 (33 S. E. 686). Statutes like that of Indiana can with much more reason be held to include only confidential communications than can those where the word "any" is employed.

In most of the states, as in Oregon, "any communication" are the words found in the statute: Revised Statutes of Arizona (1913), Civil Code, § 1677, subd.

3; Digest of the Statutes of Arkansas (1916), § 3406, subd. 3; Code of Civil Procedure (California), § 1881. See, also, amendatory act of 1917 found in statutes and amendments to the Code of California (1917), Extra Session 1916, p. 954; 2 Mills Ann. Statutes of Colorado (1912), § 8072; 2 Idaho Compiled Statutes (1919), § 7937; Compiled Code of Iowa (1919), § 7314; 3 Compiled Laws of Michigan 1915 (12555), § 67; General Statutes of Minnesota (1913), § 8375; 2 Revised Codes of Montana (1907), § 7892; New Mexico Statutes, Ann. Code (1915), § 2174; 2 Compiled Laws of North Dakota (1913), § 7871; 5 Page & Adams Ann. Ohio General Code, § 11494; 2 Revised Laws of Oklahoma (1910), § 5050; General Laws of Rhode Island (1909), p. 1033, Chap. 292, § 39; 2 Criminal Code of South Carolina (1912), Chap. VI, § 91; 2 Revised Laws of Nevada (1912), § 5424; 1 South Dakota Revised Code (1919), § 2717; Revised Statutes of Nebraska (1913), § 7893; 2 West Virginia Code, § 2662; Carroll's Kentucky Codes (6 ed.) (1919), § 606 of the Civil Code; 2 Virginia Code Ann. (1904), § 3346-a, subd. 3; Revised Statutes of Utah (1898), § 3414; 2 Ballinger's Ann. Codes and Statutes of Washington, § 5994. In Illinois the language of the statute is "any admissions or conversations" (vol. 3, Illinois Ann. Statutes (1913), § 5522); and in Missouri the words are "any admission or conversations" (2 Revised Statutes of Missouri (1909), § 6359). Although twenty-three states besides Oregon have statutes employing the words "any communication," and two others use the possibly equivalent words "any admissions or conversations," it does not necessarily follow from the coincidence in that one particular that all these states furnish judicial precedents which can be logically applied to our statute. There are differences in thought and phrasing which

in some respects produce marked differences in substance rather than merely in form, and therefore every judicial decision rendered in a state having a statute must be read in the light of the language found in that statute. A few of the states have statutes so nearly like our own upon the subject of communications between husband and wife that for all practical purposes each may be said to be identical with the other; and yet, if with these few states having statutes identically the same as ours we also include the states having statutes merely similar to ours, it will be found that only twelve states, including Arizona, California, Colorado, Idaho, Michigan, Minnesota, Montana, North Dakota, South Dakota, Nevada, Utah, and Washington can be so classified. Even among these twelve states different exceptions to the rule of privilege are specified, notably in the states of Arizona, California, Nevada, and South Dakota, where actions for alienation of affections are excluded from the operation of the privilege. In this connection it should be added that California did not except cases for the alienation of affections until 1917, and it may be here further stated that in Wyoming in no case shall the husband or wife be a witness against the other except in certain cases among which are cases for the alienation of the other's affections, and husband or wife shall not, testify "except as provided in Section 4536": Wyoming Comp. Statutes (1910), §§ 4536 and 4537. In the remaining thirteen of the twenty-five states which, like Oregon, use the words "any communication" or their equivalent, the characterizing differences are more marked. The specified exceptions are sometimes radically different, not only in substance but in phraseology. In some of the statutes the language is so phrased as to express an absolute disqualification

rather than a mere privilege capable of being waived; *Robinson* v. *Robinson,* 22 R. I. 121 (46 Atl. 455, 84 Am. St. Rep. 832). In Oregon and in the twelve states which have statutes either identical with or similar to ours, there is an express recognition of the right to waive the privilege accorded to communications, for the language of these statutes is to the effect that one cannot be, "without the consent of the other," examined as to any communication; but in approximately half of the states using the words "any communication" the statute is silent upon the subject of waiver. This distinguishing characteristic is pointed out and commented upon in *Luick* v. *Arends,* 21 N. D. 614, 641 (132 N. W. 353), when discussing the decision rendered in *Sexton* v. *Sexton,* 129 Iowa, 487 (105 N. W. 314, 2 L. R. A. (N. S.) 708), where the Supreme Court of Iowa held that the words "any communication" did not prohibit the one spouse from revealing, in an action for alienation of affections, communications made by the other spouse.

The words "any communication" or their equivalent "any conversation" have been given their natural and primary signification and construed to mean "all" communications, in California, Colorado, Illinois, Rhode Island and Virginia: *People* v. *Mullings,* 83 Cal. 138 (23 Pac. 229, 17 Am. St. Rep. 223); *Park* v. *Park,* 40 Colo. 354, 360 (91 Pac. 830); *Reeves* v. *Herr,* 59 Ill. 81, 84; *Mueller* v. *Knollenberg,* 161 Ill. App. 107; *Donnan* v. *Donnan,* 236 Ill. 341, 345 (86 N. E. 279); *Campbell* v. *Chace,* 12 R. I. 333; *Wilke's Admr.* v. *Wilkes,* 115 Va. 886, 892 (80 S. E. 745). See, also, *Hoyt* v. *Davis,* 21 Mo. App. 235; *Waddle* v. *McWilliams,* 21 Mo. App. 298; *Holman* v. *Bachus,* 73 Mo. 49. At this point in the discussion it is appropriate to mention the fact that when the Code of Virginia was

revised in 1919, the statute was changed so that neither spouse shall without the consent of the other be examined in any case "as to any communication privately made": Code of Virginia (1919), § 6212. A contrary conclusion has been reached in Iowa, Michigan, Ohio, Utah, and Washington, for in those states the words "any communication" have been construed to include only communications which in their nature seem to be confidential: *Sexton* v. *Sexton,* 129 Iowa, 487 (105 N. W. 314, 2 L. R. A. (N. S.) 708); *Thayer* v. *Thayer,* 22 Detroit Legal News, 789 (188 Mich. 261, 154 N. W. 32); *Holtz* v. *Dick,* 42 Ohio St. 23 (51 Am. Rep. 791); *In re Van Alstine's Estate,* 26 Utah, 193 (72 Pac. 942); *Sackman* v. *Thomas,* 24 Wash. 660 (64 Pac. 819, 827). See, also, *Higham* v. *Vanosdol,* 101 Ind. 160, 162.

M. P. Deady, A. C. Gibbs, and J. K. Kelly were the Code commissioners who prepared our Civil Code which was adopted in 1862. The territorial Code, which became effective on May 1, 1854, was prepared by James K. Kelly, Ruben P. Boise, and Daniel R. Bigelow. The men who prepared these two Codes were learned members of the legal profession, and indeed some of them were pre-eminent on the bench and at the bar, and therefore we may safely assume that both commissions were fully aware of the uncertainty that had so long existed and of the prolonged debate about whether the common-law rule included all communications or only confidential communications. Assuming then that the Code commissioners were fully informed about the history of the common-law rule, the conclusion is inevitable that they used the word "any" deliberately and advisedly and for the purpose of avoiding uncertainty, and that by so

using the word "any" they intended to embrace all communications. Had it been their purpose to limit the privilege to communications dealing with confidential matters, they could have made that purpose plain by using the word "confidential" instead of the word "any." Looking at our statute in the light of its origin, and remembering that there had been previous uncertainty and debate as to the extent of the common-law rule, and recollecting, too, that the question had not been so conclusively settled as to preclude further doubt and controversy, it is a fair conclusion to say that the Code commissioners intended to adopt the rule which had been previously announced in *O'Connor* v. *Majoribanks,* and that they deliberately chose the word "any" as the word to express their intention. That the word "any" is an adequate term with which to express the idea of "every" cannot be denied; and, indeed, no other meaning can be given to the word, unless we say that it is qualified by some other word impliedly, though not expressly, accompanying it.

It is impossible to say that the word "any" means only "confidential" communications, unless the word "confidential" is expressly or impliedly written into the statute. The lawmakers did not expressly write the word "confidential" into the statute, and the evidence furnished by the surroundings when the statute was enacted, as well as the evidence contained within the language of the statute itself, argues strongly against the implied insertion of the word "confidential." After first privileging "any communication," the statute proceeds to specify the exceptions to the privilege; and by expressly naming the exceptions, the lawmakers have impliedly excluded all other exceptions: *Watkins* v. *Lord,* 31 Idaho, 352, 356 (171 Pac. 1133). Our statute does not specify actions for the

alienation of affections as one of the exceptions. As already stated, some of the statutes in which the words "any communication" are used acknowledge that those words are comprehensive and all including by expressly declaring that the words shall not operate in actions brought by one spouse for the alienation of the affections of the other spouse.

Attention has already been directed to the fact that some statutes do and others do not recognize the right to waive the privilege. Our statute expressly recog nizes the right of waiver. One spouse may consent that the other may reveal a communication. Consent may be expressed or implied. A spouse may in terms give his or her consent to the publication of a communication. Even though a spouse does not at any time expressly consent to publication, nevertheless a communication may be such as to carry with it by plain or necessary implication, consent to publication: *Leppla* v. *Minnesota Tribune Co.,* 35 Minn. 310 (29 N. W. 127) ; *Newstrom* v. *St. Paul & Duluth R. Co.,* 61 Minn. 78 (63 N. W. 253). Dying declarations illustrate the principle of implied consent. Communications upon matters of business furnish a variety of examples. If it be supposed that a husband appoints his wife as his agent to sell his property, in that instance an implied consent is clearly manifested, for it must be assumed that he consents that she may inform the purchaser of her right to sell. There are a multitude of communications, particularly in relation to matters of business, made by one spouse to the other for the sole purpose of giving information so that such information may be used and, if need be, published. Indeed, many examples can be suggested where the communications would be utterly futile unless they could be published, and hence in those instances there results an unusually

strong implication of consent. It is generally held that communications made in the presence of third persons are not privileged (10 Ency. of Ev. 176), and although it is not now necessary to discuss the rule, or the reasons for the rule, governing this class of communications, it is manifest that the element of consent is not absent.

In brief, the words "any communication" mean that all communications between husband and wife are privileged, unless express or implied consent to publication is given, or unless the privilege is lost by being brought within one of the exceptions specified by the Code. There can be no force in the argument that the statute does not apply to alienation cases on the ground that such cases have to do with the separation and estrangement of the spouses. The statute declares that the communications are privileged if made "during the marriage" and, consequently, the words "during the marriage" serve as a complete answer to the suggested argument, although it may be conceded that the argument seems to have been approved at least in one jurisdiction having a statute containing the words "any communication."

The reasoning employed and the conclusion reached in *State* v. *Wilkins,* 72 Or. 77, 82 (142 Pac. 589), have not been overlooked. In that case, however, the court was dealing with a criminal action. In the instant case we are dealing with a civil action. It is settled that Section 733, Or. L., "does not apply to criminal prosecutions" and, consequently, what was said in *State* v. *Wilkins,* only dealt with a section of the Criminal Code and is not necessarily applicable to a section in the Civil Code, although both sections relate in some respects to the same subject matter: *State* v. *Luper,* 49 Or. 605, 607 (91 Pac. 444).

The judgment is reversed and the cause is remanded for a new trial.          Reversed and Remanded.

Benson, J., not sitting.